Mr. Justice CAMPBELL
 

 delivered the opinion of the court.
 

 
 *314
 
 Tbe appellee filed a bill in tbe Circuit Court against tbe appellants, tbe owners of tbe steamboat Convoy, a vessel formerly employed in tbe navigation of tbe Mississippi river, and wbicb, in 1849, was consumed by fire, with a cargo of cotton.
 

 Tbe appellee is an insurance corporation of Memphis, Ten- • nessee, and insured eleven hundred and fifty-two bales of tbe cotton belonging to this cargo from loss by fire; this insurance was effected upon fifteen distinct parcels, and shipped mostly from Teunessee to a number of consignees in New Orleans. Tbe- company adjusted tbe losses with the assured on their policies, and bring this suit for reimbursement, by enforcing tbe claims of tbe shippers against tbe owners.
 
 These
 
 answer tbe bill by a denial of their legal responsibility for tbe loss. They maintain that fire is one of tbe perils of tbe river Mississippi ; that all tbe bills of lading that exempt the- carrier from a loss by'perils of the river, imply fire as one of those perils; that tbe variations in tbe bills of lading, some including “fire,” and “ unavoidable accidents ” as well as fire, are referable- to •the fact that they are preferred'by different shippers, who have different forms for expressing the same legal consequence. That they all understand that a carrier is exempt from a liability for fire on a bill of lading exonerating him from tbe risks of tbe river.
 

 It was admitted on the bearing that tbe boat was consumed, without any negligence or fault of tbe owners, their agents, or servants. Tbe Circuit Court excused tbe owners from losses, wheré'the bills of lading contained an exception of fire or unavoidable accidents, but condemned them on the others, to satisfy tbe demand of the company.
 

 -It cannot be denied that tbe appellants are responsible, according to the strictness of tbe common-law rule determining tbe carrier’s liability, unless - an accidental fire is one of tbe exceptions included in tbe term “perils of tbe river..’.’ These words include risks arising from natural accidents peculiar to tbe river, wbicb do not happen by tbe intervention of man, nor are to be prevented by human prudence; and .have been extended to comprehend losses arising from some irresistible force or overwhelming power which no ordinary skill could, anticipate or evade. (Jones
 
 v.
 
 Pitcher, 3 S. and P., 136; 4 Yerg., 48; 5 Yerg., 82; Schooner Reeside, 2 Sum., 568.)
 

 They exonerate a carried from a liability for a loss arising from an attack' of pirates, or from a collision of ships, when there is no negligence or fault on the part of the master and crew. • Latterly, the courts have shown an indisposition to extend the comprehension of these words. ' The destruction of a
 
 *315
 
 vessel by- worms at sea is not accounted a loss by the perils of the sea; nor was a damage from bilging,-arising in consequence of the insufficiency of tackle for getting her from the dock; nor was damage occasioned to a vessel by her props being carried away by the tide while' she was undergoing repairs bn the beach, excused, as falling within that exception. In Laveroni
 
 v.
 
 Drury, (8 Ex. R., 166,) a question arose whether a damage to a cargo of cheese, occasioned by rats, was within the exception of the dangers or accidents of the sea and navigation; and the Continental and American authorities were cited to. the Barons of the Exchequer, to show that it was, and that the carrier was excused, he having taken the usual and proper precautions against them.
 

 That court decided otherwise, and say “the exception includes 'only a danger or accident of the sea or navigation, properly’so called, (viz: one caused by the violence of the winds and waves,
 
 a vis major,
 
 acting upon a seaworthy and substantial ship,) and does not cover damage by rats, which is a kind of destruction not peculiar to the sea or navigation, or arising directly from it, but one to which such a commodity as cheese is equally liable in a warehouse on land as in a ship at sea.” And the court conclude “that the liability of the master and- owner of a general ship is
 
 prima fade
 
 that of a common carrier; but that his responsibility may be either enlarged or qualified by the terms of the bill of lading, if there be one; and that the question, whether the defendant is liable or not, is to be ascertained by this document when it exists.” The principle of these cases establishes a liability against a carrier for a loss by fire arising from other'than a natural cause, whether occurring on a steamboat accidentally, or communicated from another vessel or from the shore-; and the fact that fire produces the motive power of the boat does not affect the case. (New J. S. N. Co.
 
 v.
 
 Merchants’ Bank, 6 How., 344, 381; Hale
 
 v.
 
 N. J. S. N. Co., 15 Conn., 539; Singleton
 
 v.
 
 Hilliard, 1 Strab., 203; Gilmore
 
 v.
 
 Carman, 1 S. and N., 279.)
 

 In this suit, a.witness was introduced, who claims to have been long familiar with the usages of the navigation and the river insurance risks of the Mississippi, and competent to testify in. reference to the perils of that river. He says, “those .áre, sinking, by coming in collision with rocks, snags, or other boats or vessels, and fire; that the most common form of bills of lading contains the exceptions, perils of the river and fire; but that in many instances the word fire is omitted, and he has not known an instance where the want of that word has created a difficulty in adjusting a loss, or was considered to give a claim against a boat on account of a loss by fire.” The first inquiry
 
 *316
 
 is, whether this evidence is admissible. In mercantile con- ' tracts, evidence is admissible to prove that the words in which ’the particular contract is expressed, in the particular trade to which the contract refers, are used in a peculiar sense, and different from that which they ordinarily import, and to annex incidents to written contracts, in respect to which they are silent, but which both parties probably contemplated, because usual in such contracts.
 

 But although it is competent to explain what is ambiguous, and to introduce what is omitted, because sanctioned by usage, it is .not competent to vary or contradict the terms of the con-, tract. The exceptions in the bills of lading under consideration have been in use in policies of insurance' and contracts of affreightment for a long periód, añd have' acquired a distinct signification in the customs' of merchants, and the opinions of professional men and courts. It would be surprising if any particular or artificial, meaning was attached to them in the customs of the Mississippi river, contrary to, or distinguishable from, that which existed elsewhere in the community of shippers and merchants. In this case, the evidence fails to establish any peculiar sense of these words, as appropriate to the locality where the parties to this contract reside and made their contract. The evidence rather serves to' show that the witness did not recognise the liability of a carrier, as it exists in the common.law,.and was ready to acquit him of responsibility for losses to which he did .not contribute, by the negli-fence or fault either of himself or his agents. In Turney
 
 v.
 
 Wilson, (7 Yerger, 340) — a case decided in the State from which the shipment's- described in the bill were chiefly made— evidence was offered to show there was an implied contract recognised'in the usages of shippérs and merchants, which had prevailed from the first settlement of the country, to exempt the carrier from losses, except those proceeding from negligence or dishonesty to explain or construe a bill of lading of the common form. The court decided, that the dangers of the river were such as could not have been prevented by human skill and foresight, and were incident to river navigation. That all evidence was irrelevant that did not show that the loss was occasioned By the act of Q-od, the enemies of the country, or dangers of the river; that the custom could not affect or in anywise alter the written contract of the parties, as contained in the bill of lading, as the language had. a definite legal meaning which this custom could not change. A similar question arose in the case of the Schooner Reeside, (2 Sum., 568,) where Justice Story condemns, in pointed language, the habit of admitting loose and inconclusive usages and customs
 
 *317
 

 “to
 
 outweigh, the well-known and well-settled principles of law.” And in Rogers
 
 v.
 
 Mechanics’ Insurance Co., (1 Story, 601,) he denies the authority of a usage of a particular port, in a particular trade, to limit or control or qualify the language of mercantile contracts, such as. a policy of insurance. A usage such as is pleaded in this suit, if existing, must be notorious and certain, and have been uniform- in its application and long established in practice. It must have been exhibited in the transactions of the individuals and corporations concerned, in conducting the business of shipments, transportation, and insurance, through the Mississippi valley.
 

 If the evidence had established that policies of insurance there did not designate fire among the.risks assumed; that the words “perils of the river” were used to include that risk, .and losses by fire had been uniformly settled under that clause in the policy; that contracts of affreightment had been made and losses «adjusted on the same conditions; that these usages had received the sanction of professional and. judicial opinion in the States bordering that river — the cause of the appellants would have presented different considerations.' The record contains nothing to exempt them from the legal rule of liability, as established by the common law. Seven of the hills of lading produced contain the exception, “perils of the river and fire; ” three others add to the perils of the river, “unavoidable accidents; ” and in these cases the Circuit Court exonerated •the appellants from responsibility.
 

 The appellants further contend that the insurance company is not subrogated to the claims of the shippers of the cotton, whose losses have been adjusted on their policies of insurance; ;or, if this is so, still their suit should have been at law, in the name of the assured — the remedy being adequate and complete. In Randell
 
 v.
 
 Cochran, (1 Vesey, sen., 98,) the chancellor replied to a similar objection, “that the plaintiff had the .plainest equity that could be.” The person originally sustaining the loss was the-owner; but, after satisfaction made to him, the insurer. And in White
 
 v.
 
 Dabinson, (14 Sim., 273,) an insurer enforced a lien on a judgment recovered by the assured for a loss, where the loss had been partially settled by him, on the policy. (Monticello
 
 v.
 
 Morrison, 17 How., 152.) These cases also show that an insurer , may apply to equity whenever, an impediment exists to the exercise of his legal remedy in the name of the assured.
 

 The bill discloses fifteen different contracts of affreightment, of a:similar character, which have been.adjusted by the appel-lees, and which form the subject of this suit.
 

 - They have been joined in the same bill, and much ineon-
 
 *318
 
 venience and vexation have been prevented. "Without further inquiry, we think a sufficient ground for a resort to equity is disclosed.
 

 Decree affirmed.