## The Frank G. Fowler.

*(District Court, S. D. New York.  February 4, 1881.)*

1. Damage to Tow—Navigating Channel of Harbor—Negligence—Compass —Release—Insurers—Interest of Insured.

Where the steam-tug F. G. F., while attempting to get out of Stamford harbor on her way to Norwalk, having in tow a barge with lumber, ran her on Forked reef, at the mouth of the harbor, in the morning of November 25th, thereby breaking through her bottom and causing her to fill, and the tug at the time was outside and east of the channel, and heading S. by E. instead of S. ½ W., her true course, and the libellants, an insurance company, having paid for the repairs, brought suit, and the claimants contended that the accident was due to a snow-storm, which obscured the view of the landmarks,—

*Held*, on the evidence, that the fact of the tug getting so far out of the channel in so short a distance was not due to the obscuring of the lights by the storm as the primary cause, but to the pilot not keeping a good lookout, and proceeding cautiously, with the aid of a good compass; that the compass was not used as claimed by the pilot; that the accident was wholly due to the fault of the tug, and the libellants were entitled to recover.

*Also held*, that the allegation of the claimants as to the libellant's agreement to release the tug upon condition that she should unload the cargo, render certain assistance to the wrecking steamer, etc., was grossly improbable, under the circumstances shown to exist at the time, and that the authority of the agent of the underwriters to make the agreement was not proven.

*Held, further*, that the libellants having paid the loss, and thus being entitled to the damages, could maintain a suit in admiralty, without proof of abandonment or assignment by the assured; that the answer, having admitted that the libellants were the underwriters on the hull, did not fairly raise the issue as to the right of the assured, who had hired the barge, to insure for the owners.

In Admiralty.

*T. E. Stillman* and *W. Mynderse*, for libellant.

*W. R. Beebe*, for claimants.

CHOATE, D. J. This is a suit against the steam-tug Frank G. Fowler to recover damages sustained by the barge W. M. McClave, which was insured by the libellant, and which the libellant has caused to be repaired by reason of her being run on the rocks at the mouth of Stamford harbor on the morning of the twenty-fifth day of November, 1880, through the carelessness, as is alleged, of those in charge of the tug. The barge was in tow of the tug, and bound from Stamford, Connecticut, to Norwalk, Connecticut, laden with a cargo of lumber. The libel alleges that the tug, on reaching the mouth of the river off Shippan point, increased her speed to full speed, and instead of following the regular channel to the deep water of Long Island sound, kept off to the eastward and carried the barge on the ledge or reef of rocks known as "Forked Reef," and there the barge grounded; that it was then about high water, and as the tide fell the rocks upon which the barge grounded broke through her bottom, causing her to fill with water; that the tug was not fitted with a compass, and the disaster was due in some measure to their being no compass on board by which the master could have determined and followed a safe course for his vessel and the barge, and would have been advised that the course he was on was an improper and dangerous course, also that those in charge of the tug did not keep a good lookout in not heeding the lights and landmarks, which were clearly to be seen, and which would have indicated to them the proper channel, and their improper course; that the tug proceeded at too high a rate of speed, and was in fault in attempting to cross the shoals and reef on which the barge grounded, instead of going down the channel to deep water, and so around the shoal and reef; that the barge was without fault, and at all times followed closely in the wake of the tug. To the averments of the libel that the libellant, in the regular course of its business, issued its policy of insurance in the sum of $6,000 upon the hull of the barge, which was valued therein at that sum, though in fact of greater value, the claimants answered that—

" They have no knowledge as to said averments, and therefore leave the libellant to make such proof thereof as they may be advised, except that they have been informed and believed that the libellants were the underwriters of the hull of the said barge."

The answer admitted that the grounding of the barge was without fault of those in charge of her, and that she at all times followed closely in the wake of the tug.

The answer set up as a defence the following facts: That when she left Stamford with her tow she was properly manned and equipped, provided with a compass, and in every way fitted for the voyage; that the weather and tide appeared favorable, and she proceeded slowly down the river, and when she reached about the vicinity of the place where the barge stranded a heavy snow-storm set in, thereby obscuring landmarks and lights; that the only course to be adopted under such circumstances was to proceed slowly, which was done, and every care was taken to keep the channel and avoid all obstructions, but that when she was within 40 feet of a beacon, which the storm had entirely obscured, the barge stranded. The answer denies that the accident was caused by the faults attributed in the libel to those in charge of the tug. The answer also sets up a subsequent agreement between the owner of the tug and the libellant that if the owner of the tug would complete the removal of the cargo, which had already been commenced by the captain of the tug, tow her off the rocks, and auction her at the place where the wrecking steamer could take her in tow, and tow the barge loaded with the stranded barge's cargo to Norwalk, pay all the bills incurred by the captain of the tug up to that time connected with the discharge of the cargo, and tow as required some of the wrecking company's plant from Stamford to City Island, or any other place in that vicinity, as might be ordered, the libellant would accept the barge at anchor, and release the tug-boat and her owners from all costs and expenses which from that time might be incurred for repairs, refitting, and towage of the barge, as well as all liability of the tug or her owners on account of the stranding. The evidence is that the tug with her tow started from Stamford by way of the canal and the river on this voyage, following immediately in the wake of the steam-tug Vim which was bound for New York; that after they left Stamford there was a slight fall of snow, but for some time they had no difficulty in making out the lights on the shore, and the landmarks; that it is usual to navigate this harbor by ranges and landmarks, rather than by the compass; that the passage at the mouth of the harbor is rocky on both sides. The evidence is very conflicting as to the point where, if at all, the snow-storm became so thick that the pilots lost sight of the lights and landmarks on the shore. I think the weight of the evidence is that they did so before they reached the place where the barge stranded. It is true that it is very positively testified to by several witnesses that the lights and landmarks continued to be visible, but these witnesses had no duty to perform with reference to the obser-

vation of them, and no particular reason for taking notice of the precise place where they disappeared from view.

The pilot of the Vim testified that before reaching the place where the barge stranded they had disappeared, and thereafter he proceeded by the aid of his compass, taking his soundings once with the lead. Although his credibility is called in question by the counsel for the claimants, because he testified that in his judgment it was good luck that he got out safely, I see no reason to reject his testimony to matters of fact about which he cannot be mistaken, even if in matters of judgment and opinion he has shown some bias in favor of the claimants, whose tug he was instrumental in employing in this service for his own owners. But where the lights and landmarks became obscured is still a question. The answer does not claim that this happened till the tug was *in the vicinity* of the place where the barge grounded. The testimony of the pilot is to the effect that it happened about half-way between the mouth of the canal and the place of stranding. In either case, I think, the evidence warrants the conclusion that a careful pilot, familiar with the channel, proceeding cautiously, by the aid of a good compass, and using the lead, could have made his way safely out of the harbor. The pilot of the Vim did so; I think not by accident or pure good luck. Where the barge stranded she was heading about S. by E. She was a considerable distance to to the eastward and outside of the channel. Her true course out was S. $\frac{1}{2}$ W. I think the tug could not have got so far out of the channel in so short a distance, nor have been so far off from her true course, if her pilot had kept a good lookout, observed where he was when the lights and landmarks disappeared, and thereafter proceeded with caution and care, as alleged in the answer, by the aid of his compass. The departure from the true course actually proved, cannot be attributed upon the evidence to the mere obscuring of the lights and landmarks as the chief or primary cause, and therefore this defence is not made out. There is a great deal of testimony as to the admissions of the master of the tug, that he had no compass, or that it was in the locker and of no use. Ordinarily such testimony of admissions by the pilot in charge of the accused vessel are entitled to almost no weight, because of the great uncertainty in the proof of what was actually said. In this case, however, the admissions were made to so many persons, and are so well authenticated, as to destroy the value of the testimony of the pilot as to the use he made of the compass. Upon the whole evidence, I find that the charges of fault contained in the libel against the tug are established.

As respects the alleged subsequent agreement to release the tug, it is positively denied by the agent of the underwriters, who is claimed to have made it on their behalf. The evidence in favor of it consists of very loose and uncertain testimony of conversations. It is grossly improbable, under the circumstances shown to have existed at the time, and there is no sufficient proof of the authority of the agent to bind the underwriters by the alleged agreement. The proof is insufficient to establish it.

Objection is made by the claimant that the libellant cannot maintain this action because there is no proof of a total loss, and an abandonment, or of an assignment of the claim by the insured. Whatever difficulty there might be in a common-law suit, I think it is now settled that an insurer may, in the admiralty, maintain such an action for damages against the offending vessel in his own name after payment of the loss. The insurer in such a case is the party really entitled to the damages, and as such the party in whose name action should more properly be brought. *The Monticello,* 17 How. 152; *Frely* v. *Bull,* 12 How. 468. See, also, *Hall* v. *Railroad Co.* 13 Wall. 367; *Memphis Ins. Co.* v. *Garrison,* 19 How. 312.

At the close of the case objection was made that sufficient evidence of interest in the assured had not been shown. It appeared, however, that the policy was taken out by the firm of Warfords, Robinson & Hinman, for the benefit of whom it may concern, and that the barge was used in their business, and was one of a large number of barges run by them; that she belonged partly to one of the members of the firm, Hinman, who had possession of the policy at the time of the disaster, and that they were accustomed to insure the barges used in their line.

While the evidence of authority to insure for the owners is certainly very slight, beyond the interest of Hinman, yet I think this question is not fairly raised by the answer, which, in admitting the fact that the libellant was the underwriter on the hull of the barge, has, I think, admitted that the policy was valid.

Decree for libellant, with costs.