FULLER *et al. v.* DETROIT FIRE & MARINE INS. Co. *et al.*

*(Circuit Court, N. D. Illinois.    October 29, 1888.)*

1. INSURANCE—APPORTIONMENT OF LOSS—EQUITY—JURISDICTION.
    Where there is a claim against several insurance companies for the same loss, upon different policies, a court of equity has jurisdiction to apportion the loss among the respective companies, and require payment from each of the amount for which it is liable.
2. SAME—PROOF OF LOSS.
    In such a case it is not necessary for the claimants to apportion, or attempt to apportion, the loss among the different insurers, in their preliminary proofs, although the policies require that the insured shall, in case of loss, furnish to the insurer a full and detailed statement of the loss and the amount claimed.

In Equity.    On exceptions to master's report.

Action by William A. Fuller and others against the Detroit Fire & Marine Insurance Company and others, on fire and marine insurance policies on the steamer Buckeye, to ascertain and apportion the loss among the respective classes of defendants.    After issue joined, the case was referred to a master, who filed his report in accordance with the reference, to which the different classes of defendants excepted.

*W. P. Black*, for complainants.

*Schuyler & Kremer* and *H. D. Goulder*, for marine insurers.

*E. H. & N. E. Gary* and *G. D. Van Dyke*, for fire insurers.

BLODGETT, J. This case is now before the court upon exceptions filed by the defendants to the master's report. The material facts set out in the bill and shown in the proofs are: That the complainants on the 28th day of February, 1885, became the owners of the steamer Buckeye, then lying in the port of Chicago, and on said day took out insurance against fire on the hull, boilers, engines, machinery, tackle, apparel, and furniture of said steamer, to the amount of $12,000, as follows: Sun Fire Insurance Office of London, Eng., $2,500; Louisville Underwriters of Louisville, Ky., $2,500; Reading Fire Insurance Company of Pennsylvania, $1,500; Fire Association of Philadelphia, $2,500; Manufacturers & Builders Fire Insurance Company of New York, $1,500; Citizens Insurance Company of Pittsburgh, $1,500. These policies were all for the term of one year, and gave permission to navigate the great lakes and waters tributary thereto; also, to make ordinary alterations and repairs; and permitted other insurance. And on the 30th day of May, 1885, complainants took out marine insurance on said steamer, her engines, boilers, machinery, tackle, apparel, and furniture, as follows: The Mercantile Insurance Company of Cleveland, Ohio, $5,000; Phœnix Insurance Company of Brooklyn, N. Y., $5,000; the Detroit Fire & Marine Insurance Company of Michigan, $5,000. In the body of the policies it was provided that the insurance was touching the "adventures and perils of the lakes, rivers, canals, fires, and jettisons that shall come to the damage of the said vessel, or any part thereof." In the policy of the Detroit Fire & Marine Insurance Company the word "fire" was erased from the clause above quoted in the printed form, and on the margin of the policy was stamped the following provision: "Warranted free from any claim for loss caused by or in consequence of fire," and substantially the same clause was stamped upon the margins of each of the other policies, but the word "fire" was not erased from the body of the printed form of the policies. For a day or two prior to the 12th day of June, 1885, the said steamer was engaged in taking on a cargo of about 8,000 partly-seasoned cedar railroad ties, at Houston's bay, near the Gran Manitoulin islands, on the north side of Lake Huron; and on the morning of the 12th of June the steamer left Houston's bay, at about half past 5 o'clock, for St. Michael's bay, where she was to take in tow a schooner for the port of Chicago. The steamer had on board a pilot and chart, and proceeded at a slow rate of speed, probably not to exceed four miles an hour; and when about half the distance between Houston's bay and St. Michael's bay she struck upon a rock, not laid down in the chart, and unknown to the pilot, and slid about half her length upon the rock before she stopped. Before she ran upon the rock she was drawing about 10 feet of water forward, and about 11½ feet aft. There was a heavy sea running at the time the vessel struck, which caused her to pound somewhat, as she rested upon the rock near her middle, and just forward of the for-

ward end of her boiler-room.   The rock seems to have been an isolated one, and all around it was deep water.   Fruitless efforts were made by the master and crew by means of her own machinery to back her off from the rock or to drive her over it.   About one-third of her cargo was stored in her hold, and the remainder was upon her deck, and for the purpose of relieving her so that she could be got off the rock, if possible, about 2,000 of the ties forming part of her deck-load were thrown overboard.   It was soon found, however, by her master and the crew, that the attempt to relieve her in this manner only caused her to pound the harder. Soon after she struck she was found to be leaking rapidly, and within less than an hour the water had made such headway as to put out the fires in her fire-box; and shortly after her fires were extinguished a fire broke out in the forward end of her boiler-room, which spread with great rapidity, and resulted in the complete destruction of the steamer and her machinery.   Before the fire was discovered, a small boat and crew had been dispatched to St. Michael's bay to obtain the assistance of a powerful and thoroughly equipped Canadian tug, then lying at St. Michael's bay, and this tug came out to the assistance of the steamer while she was burning, but was unable to do anything towards getting her off, or to extinguish the fire.   There is no dispute but what the loss was total, as nothing was saved to the complainants from the wreck.   It is true that the proof shows that one small anchor was taken from the bow of the steamer by the crew of the tug which was summoned to her assistance, but the tug crew seem to have treated it as their own; at least they never delivered it to the complainant, and there is no serious contention that the loss was not total.   Proofs of loss as called for by the terms of the respective policies were submitted in apt time by the complainants to the respective insurance companies; these proofs claiming that the extent of the loss sustained by the complainants from the destruction of the steamer was $19,-950.   None of these insurance companies have paid or offered to pay the complainants any part of the loss thus sustained; the fire insurance companies insisting that the loss was wholly by a peril of the sea, while the marine insurance companies insisted that the loss was mainly a fire loss, and that the chief burden of the loss should fall upon the fire insurance companies.   The marine insurance companies conceded that they were liable to the extent of the marine injury only; that is, the cost of getting the steamer off the rock where she was stranded, and to a port of safety, and of such repairs as would restore her to the condition in which she was at the time of the stranding.   The bill asks that the court ascertain and determine the amount of the loss sustained, and the portion thereof which should be borne by the respective classes of insurance; that is, how much of the loss shall be borne and paid by the marine insurance companies, and how much shall be borne and paid by the fire insurance companies, and that the portion of the loss to be borne by each class be apportioned to the respective companies of such class.   All the insurance companies were made parties to this bill, and appeared and answered, and, after issue joined, the case was referred to the master to take proofs and report his findings in the premises.

The master's report filed in pursuance of this reference in substance finds the extent of complainant's loss by the stranding and burning of the steamer to be $18,000; that up to the time the fire broke out the loss was wholly a maritime loss, to be borne solely by the marine insurance; and he finds the amount of such loss to be $6,000,—that is, he finds that it would have cost $6,000 to have got the steamer off the rock, tow her to a port of safety, and make the repairs necessary to restore her to the serviceable condition in which she was immediately preceding the stranding. He also finds that the stranding was the proximate cause of the fire; and that the marine and fire insurance were concurrent, as to the loss by the fire, to the extent of $9,000; and that the fire insurance companies are solely liable for the excess of the loss above the total amount of the marine insurance, which is $3,000, and apportions the loss as follows: Marine loss from stranding alone, before the fire broke out, and to be paid solely by marine insurance companies, $6,000; concurrent insurance, to be divided between the two classes of insurers, $9,000, of which the marine companies are to pay five-ninths, $5,000, and the fire companies are to pay four-ninths, $4,000; and the amount to be paid solely by the fire companies, $3,000.

Both classes of defendants have filed exceptions to the master's report, but I do not deem it necessary to consider them in detail, as most of them relate to the master's findings of fact upon the proof before him; and, after a careful review of these proofs, I am satisfied that his findings upon all the questions of fact are correct, and should be sustained. It is true there is much conflict in the testimony; a large portion of it being as to the cost of rescuing and repairing the steamer, and as to the probability of saving her, and as to the origin or cause of the fire and the value of the steamer. Very much of it consists of the opinions or judgments of witnesses more or less familiar with the subject upon which they testify, and I will merely say that it is my conclusion that the master has carefully analyzed this mass of testimony, and found the facts intelligently, according to the preponderance of the proofs. Others of the exceptions go to the finding of the master in regard to apportionment of the loss between the two classes of insurers, and, after a full discussion by the counsel for the objecting companies of the apportionment made by the master, and the rulings and reasons by which he reached that apportionment, I am of opinion that he has adopted the correct rule, and made a just and proper apportionment according to the relative liabilities of the two classes of insurers, and of the companies constituting those two classes.

Two questions of law are, however, raised by the exceptions filed in behalf of the fire insurance companies, which require some consideration: (1) Has a court of equity jurisdiction, upon the case made by the bill and proofs in this case, to apportion this loss among these respective defendants, and require payment from each of the amount for which it is liable? (2) Were the preliminary proofs of loss presented by the complainants to the fire companies a sufficient compliance with the conditions of the policies?

As to the first question, it is obvious that, in separate suits at law against each of these insurers, the complainants would have been required to establish by proof to a jury, or to the judge in case a jury was waived, the proportion of loss to be borne by each class of insurers, as well as the amount to be paid by each member of that class,—that is, how much of the loss, if any, should be borne alone by the marine insurance, and how much, if any, should be borne alone by the fire insurance, and how much, if any, should be borne by the two classes jointly; and it is clear that courts and juries might, and probably would, have differed widely as to the division of the loss between the two classes of insurers, if not as to the division between the members of such classes, and hence the complainants in suits at law would have been in peril of failing to recover perhaps a large portion of their actual loss by reason of different findings of juries or courts upon the same evidence. And, when several parties are liable to a contribution for the payment of a common debt or obligation, an apportionment of the amount to be contributed and paid by each has always been deemed within the field of equity jurisprudence. 1 Story, Eq. Jur. § 492. And the same learned writer, in section 478 of the same work, gives the reasons for such exercise of jurisdiction as follows:

"But there are many difficulties in proceeding in cases where an apportionment or contribution is allowed at the common law; for, where the parties are numerous, as each is liable to contribute only for his own portion, separate actions and verdicts may become necessary against each other, and thus a multiplicity of suits may take place; and no judgment in one suit will be conclusive in regard to the amount of contribution in a suit against another person; * * * whereas in equity all parties can at once be brought before the court in a single suit, and the decree apportioning will thus be conclusive upon all parties in interest."

And in a case of general average, where a part of the cargo of a ship has been sacrificed for the purpose of saving the ship and the remainder of the cargo, a court of equity has always been held the proper tribunal to apportion the contribution to be made by the ship, the freight, and the cargo saved, to compensate for the property sacrificed; and the reasons for such jurisdiction are fully stated as follows, in section 491 of the work from which I have just quoted:

"It may readily be perceived how difficult it would be for a court of law to apportion and adjust the amount which is to be paid by each distinct interest which is involved in the common calamity and expenditure. Take, for instance, the common case of a general ship or packet trading between Liverpool and New York, and having on board various shipments of goods, not unfrequently exceeding a hundred in number, consigned to different persons, as owners or consignees; and suppose a case of general average to arise during the voyage, and the loss or expenditure to be apportioned among all these various shippers according to their respective interests, and the amount which the whole cargo is to contribute to the reimbursement thereof. By the general rule of the maritime law, in all cases of general average, the ship, the freight for the voyage, and the cargo on board, are to contribute to such reimbursement, according to their relative values. The first step in the process of general average is to ascertain the amount of the loss for which contribution is to be made; as, for instance, in the case of jettison, the value of the

property thrown overboard, or sacrificed for the common preservation. The value is generally indefinite and unascertained, and from its very nature, rarely admits of an exact and fixed computation. The same remark applies to the case of ascertainment of the value of the contributory interest, the ship, the freight, and the cargo. These are generally differently estimated by different persons, and rarely admit of a positive and indisputable estimation in price or value. Now, as the owners of the ship, and the freight, and the cargo, may be, and generally are, in the supposed case, different persons, having a separate interest, and often an adverse interest to each other, it is obvious that unless all the persons in interest can be made parties in one common suit, so as to have the whole adjustment made at once, and made binding upon all of them, infinite embarrassments must arise in ascertaining and apportioning the general average. In a proceeding at the common law, every party having a sole and distinct interest must be separately sued, and, as the verdict and judgment in one case will not only not be conclusive, but not even be admissible evidence in another suit, as it is *res inter alios acta*, and as the amount to be recovered must in each case depend upon the value of all the interests to be affected, which, of course, might be differently estimated by different juries, it is manifest that the grossest injustice or the most oppressive litigation might take place in all cases of general average on board of general ships. A court of equity, having authority to bring all the parties before it, and to refer the whole matter to a master to take an account, and to adjust the whole apportionment at once, affords a safe, convenient, and expeditious remedy; and it is accordingly the customary mode of remedy in all cases where a controversy arises, and a court of equity exists in the place, capable of administering the remedy."

And the same is stated in Adams, Eq. *268, and *Garrison* v. *Insurance Co.*, 19 How. 312. In the latter case the jurisdiction of a court of equity to apportion and enforce payment of a loss, where there was a large number of insurers, was fully sustained, both on the ground of the right of a court of equity to apportion among contributors, and also to prevent a multiplicity of suits; there being fifteen insurers in that case, while here there are nine. These authorities, and others to which my attention has been called, seem to me to amply support the jurisdiction of this court to give the relief asked by this bill, while the complainants' remedy at law would almost necessarily be uncertain and incomplete. A court of equity, with all the parties before it, can do complete justice, not only as between the complainants and the two classes of defendants, but as between the defendants in the two classes in their relations to each other under their respective policies.

By the second point, the fire insurance companies insist that they are not liable, because, they say, that all the policies require that the insured shall, in case of loss, furnish to the insurer a full and detailed statement of the loss, and the amount claimed. In the proofs of loss served by the complainants upon the fire insurance companies, they simply state the value of the steamer, her engines, etc., and that the loss was total, and did not attempt to compute or state the share of the loss to be borne by each fire insurer. I do not think it was necessary for the complainants to apportion, or attempt to apportion, this loss among the different underwriters in their preliminary proofs. It was sufficient if they stated the amount of the loss and the amount of the insurance; and this they

did, leaving each underwriter to make the computation of its own share of the loss. I do not, therefore, deem either of the exceptions filed by the defendants to be well taken, and the same are each and all overruled, and the master's report confirmed, and a decree may be prepared in accordance with the recommendation of the report.