**TRANSATLANTIC SHIPPING CO., Inc., v. ST. PAUL FIRE & MARINE INS. CO.**

(Circuit Court of Appeals, Second Circuit. December 7, 1925.)

No. 82.

1. **Shipping ⊂⟹110—Law implies contract is for carriage of goods under deck or in ordinary carrying space of ship, where bill of lading silent as to place of stowage.**

Where bill of lading is silent as to place of stowage, law implies contract is for carriage of goods under deck or in ordinary carrying space of ship.

2. **Insurance ⊂⟹155—Evidence insufficient to show common usage to carry motion picture films above deck.**

In libel against insurance company for damage to motion picture films, evidence held insufficient to show common usage among shipping companies to carry motion picture films above deck, with reference to which parties may be held to have contracted.

3. **Insurance ⊂⟹153—Evidence of usage in carrying films above deck inadmissible to vary terms of insurance contract providing for carriage below deck.**

Evidence of custom or usage in carrying motion picture films above deck is inadmissible to vary the express terms of marine insurance policy providing for carriage under deck.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by the Transatlantic Shipping Company, Inc., against the St. Paul Fire & Marine Insurance Company. From a decree dismissing the libel (298 F. 551), libelant appeals. Decree affirmed.

Macklin, Brown & Van Wyck, of New York City (Pierre M. Brown, of New York City, of counsel), for appellant.

Bigham, Englar & Jones, of New York City (D. Roger Englar and M. P. Detels, both of New York City, of counsel), for appellee.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. This suit is brought upon a certificate of insurance issued by the respondent to the libelant on September 21, 1920, insuring seven cases of films shipped by libelant on board the steamship Sylvia Victoria of the Ocean Steamship Company, to be carried from New York to Barcelona, Spain. They were insured in the sum of $12,000, and the libel alleged that while on the said voyage the goods were damaged by perils insured against to the extent of $8,608.12. At the trial a motion was made to amend this allegation to read

$12,000, in place of $8,608.12, and the motion was granted. The respondent denied any liability under the policy. The court below dismissed the libel and taxed the costs against libelant.

The policy of insurance provided as follows: "Goods, etc., insured hereunder are understood to be under deck (i. e., below main deck or within a structure built in the frame of the vessel) unless otherwise expressly stated hereon."

[1] That the policy of insurance issued in this case provided that the goods were to be carried under deck was not surprising or unusual. Where a bill of lading is silent as to the place of stowage, the law implies that the contract is for carriage of the goods, under deck, or in the ordinary carrying space of the ship. Carver on Carriage of Goods by Sea (6th Ed.) § 281. And see 36 Cyc. 253.

It was admitted that the goods were received on board the ship and were damaged by salt water to some extent during the period of insurance. The evidence disclosed, however, that the goods were not carried under deck, but were shipped and carried as deck cargo.

The evidence as to the place in which the motion picture films, herein involved, were stowed on the Sylvia Victoria was given by the superintendent of piers of the Ocean Transportation Company to which the steamship belonged. After testifying that he recollected the shipment of these films, he testified as follows:

"Q. At that time, Mr. Ryan, would your steamship company accept for shipment motion picture films in any place below the main deck of a vessel or within any structure within the frame of a vessel? A. We always shipped developed films, in my interpretation of the frame of the vessel, in the forecastle.

"Q. At that time, in the year 1920 and previous thereto, where was the only place your company would accept motion picture films for shipment? A. A developed film would be stowed in the forecastle, or poop deck, or in the spare officer's cabin on the bridge deck, any safe place where water would not reach it. That is a developed film.

"Q. These were developed films? A. These were developed films.

"Q. You would not take them below the main deck at all? A. No; never took them below deck.

"Q. The only place you would take them

would be in the officers' cabin on the bridge deck, a closed place? A. Not only there; in the forecastle or in the poop deck.

"Q. In the forecastle or poop deck? A. Yes, sir.

"Q. Would you call those structures? A. I would; yes.

"Q. Well, where were these films put? A. They were put in an officer's cabin on the bridge deck.

"Q. Do you know this? A. Yes; I know this."

And on cross-examination he said:

"Q. You said something about this shipment being marked 'On deck.' Is that the fact? A. That is the fact.

"Q. Was a dock receipt issued for it? A. On deck at shipper's risk.

"Q. You knew that personally? A. I knew that personally."

The bill of lading issued in this case does not appear in the record.

The appellant contended in this court, as it did in the court below, that there is a well-established custom among steamship companies, and also among underwriters, that moving picture films would not and could not be carried (1) below the main deck, (2) nor in any structure where other inflammable goods were stored; that the respondent should have known, and must actually have known, of this custom, and therefore knew that these goods would have to be carried otherwise than as provided in the printed clause of the policy.

The appellee, on the other hand, insisted that the evidence showed that, while moving picture films were not ordinarily carried under the main deck, it showed with equal clearness that they were quite commonly carried "within a structure built in the frame of the vessel"; i. e., within the forecastle, the bridge space, and the poop. And it claimed that, even if the appellant's argument were sound in law, it was without basis in fact, as there is nothing in the prevailing customs as to the stowage of such films which prevented their being stowed in strict compliance with the terms of the policy.

The libelant called several witnesses connected with the steamship business, and who had experience in the shipment of motion picture films. One of these, who had been connected with the Barber Steamship Lines for 23 years was allowed to testify over objection as follows:

"Q. In the year 1920, would the Barber Lines upon any of their ships accept mo-

9 F.(2d)—46

tion picture films for underdeck shipment? A. No, sir."

On cross-examination he testified:

"Q. I would like to find out just what you mean by that. Take, for example, on a three-island ship, a poop, bridge, and forecastle ship; would you allow them to put them in the poop space or the forecastle space? A. Not as a rule. There might be a case where there was no other cargo in the poop, or cargo not in any way inflammable or dangerous to moving pictures, and stowed in a place where in case of fire they could be withdrawn quickly, where it might happen; but our practice is not only to put them in the poop, or bridge deck, but to carry them on the open.

"Q. There is a space under the bridge deck known as the bridge space? A. Yes, sir.

"Q. Wouldn't you carry them there? A. No, sir.

"Q. Do you know whether or not it is a fact that on other lines they are frequently carried in the bridge space or in the poop? A. I have heard of them being carried in the poop and on the bridge space.

"Q. And that bridge space is the space immediately under the bridge deck? A. Yes, sir.

"Q. The floor of the main deck is generally the floor of the bridge deck; the top of the main deck is the floor of the bridge deck; that is to say, the bridge space is the place between the main deck and the bridge deck? A. It is the superstructure rising from the main deck.

"Q. When you refer to putting anything into the bridge space, you refer to the space above the main deck and under the bridge deck? A. Yes, sir."

And on the redirect he testified:

"Q. Do you know of any other line that would ship below the main deck? A. No, sir.

"Q. Or within the frame of the vessel? A. I never heard of it; no, sir.

"Q. In your 23 years of experience? A. That is right."

The respondent called as a witness one who at the time of testifying was manager for seven marine insurance companies in New York City, and for about 20 years had been and still was the manager of the Thames & Mersey Company. His experience in insuring moving picture films was wide. He testified as follows:

"Q. Well, the precise question that is presented in this case is whether or not,

in the year 1920, there was any general rule or practice that motion picture films could not be shipped under deck. If you can tell us anything about that, I wish you would do so. A. I remember no such rule. I remember no difference in 1920 to years before or the present time, and motion picture films have been to my recollection largely carried under deck. We have done quite a number of them, actively done them, and whereas, a certain percentage of them go on deck, the bulk of them are insured with us under deck.

"The Court: Just what do you mean by under deck? Do you mean below the main deck?

"The Witness: No, sir; I would not say that the main entirely limited it, because I have many ships sometimes where I would say it was below the framework of the deck. We have many steamers where the bridge is fit for the carriage of perishable cargo.

"Q. You mean the bridge space under the bridge deck? A. Yes, sir; what we call the bridge—the bridge space. And then, again, I have seen sometimes where the bridge could not be called an under deck, a fit place; it was not entirely enclosed, so the engineers could walk right into it, and the doors, both forward and aft, were not iron doors; but in the bulk of vessels they have a hatch on the top, and the doors are sealed and fastened perfectly strong, and in that case underdeck cargo is carried there. * * *

"Q. In your experience, in insuring these films, is it the practice for on deck shipments, shipments which are not under deck, to be specifically declared and insured as such, as on deck? A. Certainly.

"Q. And if nothing is said about whether it is on deck or under deck, you would understand it is under deck? A. We would understand it is under deck, certainly."

[2, 3] It cannot be said that the evidence shows that there is a practice so well established among the shipping companies to carry moving picture films above deck that it amounts to a common usage, so that all persons can be held to have contracted with reference to it. But, if the evidence was sufficient to convince that such usage existed, we are entirely satisfied that such evidence would be wholly inadmissible to vary the terms of the contract which these parties made.

The appellant asserts that the law is well settled that, despite the prohibition contained in the policy and already set forth in this opinion, and which in effect requires the goods insured to be carried "under deck," the insurer is nevertheless liable if the goods were stowed according to well-established custom. And in support of this contention our attention has been called to a number of cases which, it is asserted, sustain the claim. The English cases cited are the following: Pelly v. Royal Exchange Assurance Co. (1757) 1 Burrows, 341; Brough v. Whitmore (1791) 4 Term R. 206; Milward v. Hibbert, 3 Q. B. 120; Apollinaris Company, Ltd., v. Nord Deutsche Insurance Co., 9 Asp. 526; Da Costa v. Edmunds, 4 Camp. 143; Noble v. Kennoway, 2 Doug. 510. And the American cases cited are the following: Taunton Copper Company v. Merchants' Insurance Co., 22 Pick. (39 Mass.) 108; Cary v. Home Insurance Co., 235 N. Y. 298, 139 N. E. 274; Wadsworth v. Pacific Insurance Co., 4 Wend. (N. Y.) 37; Orient Mutual Insurance Co. v. Reymershoffer, 56 Tex. 234; Mobile Marine Dock & Mutual Insurance Co. v. McMillan & Son, 27 Ala. 77; Merchants' & Manufacturers' Insurance Co. v. Shillito, 15 Ohio St. 559, 86 Am. Dec. 491; Macy v. Whaling Insurance Co., 9 Metc. (Mass.) 354; Howard v. Great Western Insurance Co., 109 Mass. 384.

The claim advanced is so unusual, and we may say so extraordinary, that we have examined the cases cited by the appellant with no little curiosity to ascertain whether, and upon what grounds, they support the argument which has been addressed to us. We have not found that any one of them asserts the doctrine contended for by the appellant in this case; for in no one of them did the contract of insurance, as did the policy herein involved, contain any express provision which purported to deal with the question where the goods should be stowed. In not one of them was evidence admitted to contradict the written terms of the contract of insurance. All of them are simply cases in which evidence of usage was admitted, not to contradict the express terms of the policy, but simply to explain or supplement the contract.

The law is so well settled on this subject that we cannot refrain from expressing surprise that at this late day a case should be brought into this court which cannot succeed without overruling the law in a matter so thoroughly established as is this. Moore v. United States, 196 U. S. 157, 25 S. Ct. 202, 49 L. Ed. 428; The Gazelle, 128 U. S. 474, 9 S. Ct. 139, 32 L. Ed. 496; Thompson v. Knickerbocker Life Insurance Co., 104 U. S. 252, 26 L. Ed. 765; Cincin-

nati First National Savings Bank v. Ward, 100 U. S. 195, 25 L. Ed. 621; Moran v. Prather, 23 Wall. 492, 23 L. Ed. 121; Hearne v. New England Mutual Marine Ins. Co., 20 Wall. 488, 22 L. Ed. 395; Partridge v. Phœnix Mutual Life Insurance Co., 15 Wall. 573, 21 L. Ed. 229; Stagg v. Connecticut Mutual Life Insurance Co., 10 Wall. 589, 19 L. Ed. 1038; Orient Mutual Insurance Co. v. Wright, 1 Wall. 456, 17 L. Ed. 505; Garrison v. Memphis Insurance Co., 19 How. 312, 15 L. Ed. 656.

In Hearne v. New England Mutual Marine Insurance Company, supra, the Supreme Court said: "Usage is admissible to explain an ambiguity, but it is never received to contradict what is plain in a written contract." It added: "In no case can it be received where it is inconsistent with, or repugnant to, the contract."

And in The Delaware, 14 Wall. 579, 20 L. Ed. 779, the court held that a clean bill of lading—that is to say, one which is silent as to the place of stowage—imports a contract that the goods are to be stowed under deck, and that being so parol evidence of an agreement that they were to be stowed on deck is inadmissible. The court said: "Evidence of usage is admissible in mercantile contracts to prove that the words in which the contract is expressed, in the particular trade to which the contract refers, are used in a particular sense and different from the sense which they ordinarily import; and it is also admissible in certain cases, for the purpose of annexing incidents to the contract in matters upon which the contract is silent, but it is never admitted to make a contract or to add a new element to the terms of a contract previously made by the parties."

In Partridge v. Insurance Company, supra, where an attempt was made to introduce into an express contract by proof of usage something which was not in it, the Supreme Court said that to allow it would be to establish a contract very different from the one the parties made. After referring to the admission of evidence of usage to establish an implied contract, the court declared that, "when it is sought to extend the doctrine beyond this, and incorporate the custom into an express contract, whose terms are reduced to writing and are expressed in language neither technical nor ambiguous, and therefore needing no such aid in its construction, it amounts to establishing the principle that a custom may add to or vary or contradict the well-expressed intention of the parties made in writing. No such

extension of the doctrine is consistent either with authority or with the principles which govern the law of contracts."

The rule on this subject is stated in Arnould on Insurance (9th Ed.) vol. 1, § 56, as follows: "Parol evidence, whether of usage or otherwise, can in no case be admitted to contradict or materially vary the plain and express terms of a sea policy; it can only be admitted either to explain those terms where technical or ambiguous, or to modify and add to them where they are plainly employed with reference to some usage of trade, and without such reference would, accordingly, be incomplete as an expression of the mind of the parties contracting; in such cases the courts may resort to any means of interpreting the policy so as to effectuate the real intention of the parties, which may be supplied either by the rules of the common law, the general usages of trade, or the particular circumstances of the case."

And in section 57 the same writer, stating the more prominent rules of construction in the interpretation of sea policies, names the following rule first of all: "I. Every usage of a particular branch of maritime trade which is so well settled, or so generally known, that all persons engaged in that trade may fairly be taken as contracting with reference to it, is considered to form part of every sea policy, designed to protect risks in such trade, *unless the express terms of the policy decisively repel the inference.*"

In 17 C. J. 492, the law is set down as follows: "Valid usages concerning the subject-matter of a contract of which the parties are chargeable with knowledge are by implication incorporated therein, unless expressly or impliedly excluded by its terms, and are admissible to aid in its interpretation, not as tending in any respect or manner to contradict, add to, take from, or vary the contract, but upon the theory that the usage forms a part of the contract. But evidence of usage is not admissible to vary or contradict the terms of a plain, unambiguous contract; and in the more modern cases there has been strong judicial criticism of the tendency to resort to evidence of usage when to do so would indirectly control the true intention of the parties to contracts."

And at page 483 of the same work it is said: "In the law of marine insurance it may be stated as a well-established rule that every usage of a particular trade which is so well settled or so generally known that

all persons engaged in it may be fairly considered as contracting with reference to it is considered to form part of every policy designed to protect risks in such trade, *unless the express terms of the policy repel the inference.*"

The certificate of insurance which the respondent issued constitutes a contract between it and the libelant. The insurance company therein agreed to pay the libelant $12,000 subject to the conditions of the policy, and it was expressly stated that the "goods were understood to be under deck" unless "otherwise expressly stated hereon." And it was not otherwise stated and the goods were not carried under deck. There is *no* authority known to us which supports the claim made by libelant that it is entitled to recover, notwithstanding and contrary to the terms of the express contract, because it appears that some steamships do not carry and will not carry motion picture films "under deck." The claim made is contrary to principle and an unbroken line of authorities.

The rule is so elementary that, when the parties enter into a written contract, the writing is indisputable as to the terms of the transaction, that we feel apologetic in considering this case at the length we have gone. It rests "on a rational foundation of experience and policy." Wigmore on Evidence (2d Ed.) vol. 5, § 2425. The history of the rule is set forth at length in Professor Wigmore's learned work at volume 5 (2d Ed.) § 2426.

Decree affirmed.