## SMITH v. NATIONAL BANK OF D. O. MILLS & CO.

(Circuit Court, N. D. California. October 25, 1911.)

1. BANKS AND BANKING (§ 171*)—COLLECTION AGENT—SELECTION OF SUB-AGENTS—NEGLIGENCE.

Defendant accepted a draft from plaintiff for collection through defendant's correspondent at R. Defendant sent the draft to the R. bank, by which it was negligently sent to the drawee bank for collection and "credit." The drawee bank, on receiving the draft, charged the amount to plaintiff's account, and credited the same to the account of the R. bank, sending it a credit slip therefor. At this time the drawee had ample funds with which to pay the draft, and, if presented over the counter by a third person, would have been paid in cash. The drawee failed on the next day, whereupon the R. bank refused to accept the credit, and requested that the amount of the draft be credited back to the plaintiff's account, and recharged to the R. bank's account, which request was complied with by the drawee. *Held*, that defendant in accepting the draft for collection was an independent contractor, and that the acts of the R. bank were chargeable to defendant as its agent, and not the agent of plaintiff, defendant being therefore liable for the amount of the draft.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 597–618; Dec. Dig. § 171.*]

2. PRINCIPAL AND AGENT (§ 73*)—SUBAGENTS—STATUTES.

Civ. Code Cal. § 2351, provides that a subagent lawfully appointed represents the principal in like manner with the original agent, and the original agent is not responsible to third persons for the subagent's act. *Held*, that such provision was merely declaratory of the general rule affecting the responsibility of an agent that the acts of his subagent as to third persons did not limit or affect the responsibility of such agent to his principal.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. § 151; Dec. Dig. § 73.*]

3. BANKS AND BANKING (§ 162*)—COLLECTIONS—CONTRACT.

Where the cashier of defendant bank on accepting from plaintiff a draft on a foreign bank for collection stated that they "would have to handle it through Reno," or would "send the item to Reno and have them collect it for us," such statement implied no suggestion to plaintiff that defendant thereby intended to restrict or limit its own responsibility, or that defendant intended that plaintiff should be responsible for the acts of the Reno correspondent.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 162.*]

4. CUSTOMS AND USAGES (§ 12*)—REQUISITES.

A custom to avoid an otherwise controlling rule of law must be clearly established, and the party sought to be bound must either have actual knowledge of its existence, or the usage must be so general and well known in the community as to give rise to the presumption of such knowledge.

[Ed. Note.—For other cases, see Customs and Usages, Cent. Dig. §§ 23–24; Dec. Dig. § 12.*]

5. CUSTOMS AND USAGES (§ 12*)—NOTICE—EVIDENCE.

That defendant's cashier in accepting from plaintiff a draft on a foreign bank for collection notified her that defendant would have to handle it through Reno, or would send the draft to Reno and have it collected, was insufficient to charge plaintiff with notice of an alleged custom of banks to accept such items only at the risk of the depositor.

[Ed. Note.—For other cases, see Customs and Usages, Cent. Dig. §§ 23–24; Dec. Dig. § 12.*]

6. CUSTOMS AND USAGES (§ 17*)—EXPRESS CONTRACT.

While a custom may be resorted to, to explain the meaning of a doubtful or ambiguous contract, it will not be admitted to vary or contradict the terms of an unambiguous express contract.

[Ed. Note.—For other cases, see Customs and Usages, Cent. Dig. § 34; Dec. Dig. § 17;* Evidence, Cent. Dig. §§ 1945–1952.]

At Law. Action by Bertha Smith against the National Bank of D. O. Mills & Co. Judgment for plaintiff.

This is an action to recover from the defendant, a corporation doing a general banking business at the city of Sacramento, in this state, the amount of a draft delivered to it by the plaintiff for collection. The material facts are these: Plaintiff, a resident of Nevada, had funds on deposit with the State Bank & Trust Company, a Nevada corporation, at Tonopah, in that state. Being temporarily in Sacramento, and desiring to draw upon the fund in the Tonopah bank, plaintiff, being ignorant of banking methods, on October 18, 1907, called at the banking house of defendant, and informed its cashier of her desire, and under the direction of the latter signed a draft drawn by him in favor of defendant on the Tonopah bank for $4,779.75, and delivered the draft, together with her bank book, to the cashier, he issuing to her in defendant's name a receipt therefor, reciting that the draft was received for collection, and stating to her, in substance, that defendant "would have to handle it through Reno," or would "send the item to Reno and have them collect it for us," as they did not do business direct with Tonopah.

The defendant immediately transmitted the draft to its regular correspondent, the Washoe County Bank, a responsible institution at Reno, Nev., which we may refer to as the Reno bank, with directions "for collection and returns." It was received by the latter on October 19, 1907, and on the same day was transmitted by it direct to the drawee, which was its correspondent at Tonopah and with which it had an account, with a letter of instructions "for collection and credit." The draft was received by the drawee on October 22, 1907, and immediately upon its receipt was accepted by the latter and stamped "paid," and in accordance with the letter of instructions a charge was thereupon at once entered upon the books of the drawee in the amount

of the draft against the account of the plaintiff, and a credit in the same amount entered to the account of the Reno bank. On the same day these entries were made a credit memorandum covering the item was transmitted by the drawee to the Reno bank. At this time the drawee bank was open and transacting its usual business, and had cash on hand more than sufficient to pay the draft. It continued to carry on its business as usual until 11 o'clock the next day, when it closed its doors and was taken in charge by the State Bank Examiner as insolvent, and subsequently passed into the hands of a receiver. The credit memorandum was received by the Reno bank on October 23, 1907, the day the drawee bank closed its doors, and thereafter, having been advised of the failure, the Reno bank notified the drawee that it would not accept credit on its books as constituting payment of plaintiff's draft, and requested that the amount of the draft be credited back to the account of plaintiff on its books, and charged back to its account. After some negotiation and lapse of time and upon an assurance that the Reno bank would hold it harmless in the transaction, this request was complied with by the drawee, and the entry of the countercharge made. At the time the draft was sent to the drawee there were three other banks in Tonopah and an agency of Wells Fargo & Co.'s Express at that point. The defendant bank has refused to honor plaintiff's demand for payment of the amount of the draft, and hence this suit.

Mack, Green, Brown & Heer, for plaintiff.
White, Miller & McLaughlin, for defendant.

VAN FLEET, District Judge (after stating the facts as above). [1] Aside from some minor considerations urged upon the attention of the court, which are not deemed material, the case turns upon the question whether the intermediary, the Reno bank, through whose action the failure to collect the draft manifestly resulted, is to be regarded as the agent or representative in the transaction of the defendant, or as that of the plaintiff. If it was the agent of the defendant, then the latter is responsible for its acts, and liable for the loss suffered by plaintiff through its dereliction. If, on the other hand, it is to be regarded as the agent of the plaintiff in the premises, then, of course, plaintiff's demand upon this defendant must fail.

That plaintiff's right of action is against either the defendant or the Reno bank is obvious. The drawee bank may at once be eliminated from the transaction so far as the plaintiff's rights are concerned. Having at the direction of its correspondent, the Reno bank, accepted the draft and transferred the credit on its books from the account of the plaintiff to that of the former bank, the plaintiff's funds in its hands to the amount of the draft thereupon became to all legal intents and purposes so far as plaintiff is concerned the property of the Reno bank. As suggested by counsel for plaintiff, had an attachment been thereafter, on that day, served upon the drawee at the suit of a third person, the writ would have held the credit as the property of the Reno bank. The transaction, according to universal banking methods, was a payment of the draft just as effectually as if the cash had passed; and plaintiff's rights thereunder as against the drawee were at an end. Her right thereafter to look for the proceeds of her draft was against whoever represented her in the transaction; and, of course, the subsequent attempt of the Reno bank to have the account on the books of the drawee reversed to represent its original status was without avail to affect that right, especially since it did not re-

store the conditions previously existing. What, then, are the rights of the parties in the premises? The plaintiff's attitude is that her sole representative in the transaction was the defendant, that it undertook as her agent to collect her draft, and that with the instrumentalities which it chose to employ to accomplish that purpose she had nothing to do, that the subagency chosen by the defendant for the purpose was its agency, and not plaintiff's, and, her money having been lost through the neglect of the latter, defendant is responsible for such loss, and she may look to it alone for reimbursement.

The defendant's contention, on the other hand, is, in substance, that all it undertook to do in the premises, since it could not make collection personally, was in good faith and with proper diligence to employ the usual and ordinary means for the purpose; that it did not obligate itself to make the collection, but merely to exert proper judgment in selecting an agency for plaintiff through which to make it; that, having done that, the agent so chosen became the agent of the plaintiff; and that the loss having occurred through the negligence of the latter, and through no failure on the part of defendant to properly perform its duty in the premises, it cannot be held responsible for the plaintiff's loss.

The question as to the extent of the obligation assumed by a bank in accepting commercial paper for collection at a distant point in the ordinary course of business and without special features to the contract has arisen in a great many cases, under facts not differing in legal effect from the present, and has given rise to much diversity of ruling in the courts of the different states of the Union. These decisions will generally be found aligned with one or the other of two general groups—the one supporting in its substance the contention of the plaintiff; the other sustaining that of the defendant. If we were dependent for a solution of the question upon a choice between these divergent views, it might present some considerable difficulty in reaching a conclusion satisfactory to the court. But I am of opinion that the question, so far as affecting the ruling of the federal courts, has been definitely settled by the Supreme Court in the leading case of Exchange National Bank v. Third National Bank, 112 U. S. 276, 5 Sup. Ct. 141, 28 L. Ed. 722. In that case a bank in Pittsburg discounted for the drawers, and sent for collection in ordinary course of business to a bank in New York, certain drafts drawn on a party in Newark, N. J. The New York bank, in turn, sent the drafts to a bank in Newark for presentation, acceptance, and collection. Through the neglect of the latter to have proper acceptance of the paper a loss occurred; and it was held that the Newark bank was the agent in the premises of the New York bank, and not of the sender, and that the sender was entitled to recover its loss from the New York bank; and it is said, quoting from Hoover v. Wise, 91 U. S. 308, 23 L. Ed. 392:

"That where a bank, as a collection agency, receives a note for the purposes of collection, its position is that of an independent contractor, and the instruments employed by such bank in the business contemplated are its agents, and not the subagents of the owner of the note."

All the leading authorities are exhaustively reviewed, and the diversity in the decisions in the state courts noticed; and, after such review, it is said, as to the rule applicable in such cases:

"The question involves a rule of law of general application. Whatever be the proper rule, it is one of commercial law. It concerns trade between different and distant places, and, in the absence of statutory regulations or special contract or usage having the force of law, it is not to be determined according to the views or interests of any particular individuals, classes, or localities, but according to those principles which will best promote the general welfare of the commercial community. Especially is this so when the question is presented to this tribunal, whose decisions are controlling in all cases in the federal courts. The agreement of the defendant in this case was to collect the drafts, not merely to transmit them to the Newark bank for collection. This distinction is manifest; and the question presented is whether the New York bank, first receiving these drafts for collection, is responsible for the loss or damage resulting from the default of its Newark agent. There is no statute or usage or special contract in this case to qualify or vary the obligation resulting from the deposit of the drafts with the New York bank for collection. On its receipt of the drafts under these circumstances an implied undertaking by it arose to take all necessary measures to make the demands of acceptance necessary to protect the rights of the holder against previous parties to the paper."

And, speaking of the consideration supporting such a contract, it is said:

"The taking by a bank from a customer in the usual course of business of paper for collection is sufficient evidence of a valuable consideration for the service. The general profits of the receiving bank from the business between the parties and the accommodation to the customer must all be considered together, and form a consideration, in the absence of any controlling facts to the contrary, so that the collection of the paper cannot be regarded as a gratuitous favor. Smedes v. Bank of Utica, 20 Johns. [N. Y.] 372, and 3 Cow. [N. Y.] 662; McKinster v. Bank of Utica, 9 Wend. [N. Y.] 46; affirmed in Bank of Utica v. McKinster, 11 Wend. [N. Y.] 473. The contract, then, becomes one to perform certain duties necessary for the collection of the paper and the protection of the holder. The bank is not merely appointed an attorney, authorized to select other agents to collect the paper. Its undertaking is to do the thing, and not merely to procure it to be done. In such case the bank is held to agree to answer for any default in the performance of its contract; and, whether the paper is to be collected in the place where the bank is situated, or at a distance, the contract is to use the proper means to collect the paper, and the bank, by employing subagents to perform a part of what it has contracted to do, becomes responsible to its customer. This general principle applies to all who contract to perform a service."

And again, speaking of the distinction between the effect of the contract as contended for by plaintiff and the contract as construed by the defendant, the court say:

"The distinction between the liability of one who contracts to do a thing and that of one who merely receives a delegation of authority to act for another is a fundamental one, applicable to the present case. If the agency is an undertaking to do the business, the original principal may look to the immediate contractor with himself, and is not obliged to look to inferior or distant undercontractors or subagents, when defaults occur injurious to his interest. Whether a draft is payable in the place where the bank receiving it for collection is situated, or in another place, the holder is aware that the collection must be made by a competent agent. In either case there is an implied contract of the bank that the proper measures shall be used to collect the draft, and a right on the part of its owner to presume that proper agents will be employed, he having no knowledge of the agents. There is, therefore,

no reason for liability or exemption from liability in the one case which does not apply to the other."

The principles announced in that case being controlling here are conclusive of the case, in the absence, as there stated, of some "statute or usage or special contract in this case to qualify or vary the obligation."

[2] There is no local statute affecting that obligation in any respect here involved. Section 2351 of the Civil Code of California provides that:

"A subagent, lawfully appointed, represents the principal in like manner with the original agent; and the original agent is not responsible to third persons for the acts of the subagent."

That provision merely declares a rule of general application affecting the responsibility of an agent for the acts of his subagent as to third persons; but in no way limits or affects the responsibility of such agent to his principal. Nor was there any special feature to the contract which the defendant made to take it out of the rule declared in that case.

[3] The mere statement to plaintiff by the cashier of defendant in accepting the commission that they "would have to handle it through Reno" or would "send the item to Reno and have them collect it for us" implied no suggestion to plaintiff that defendant was thereby intending to restrict or limit in any way its responsibility to her in the matter, or that defendant intended thereby that she should be responsible for the acts of their Reno correspondent. Had the defendant intended to restrict its contract and take it out of the general rule, it was its duty to distinctly inform plaintiff of the fact that she might have an opportunity to determine if she were willing to commit the service to it with such limitation. The statement made to her by defendant's cashier implied no such purpose, and hence cannot be given such effect.

But defendant's main reliance for the right to make their correspondent the agent of plaintiff and directly responsible to her is based, not so much upon any express language passing between the parties as upon an asserted custom with the banks in Sacramento never to hold themselves responsible for the acts of others in such collections, but to employ all subagents solely in behalf of and at the risk of the principal. So here we have a general rule of negligence sought to be avoided by a local custom.

[4] A custom to avoid an otherwise controlling rule of law must be clearly established, and the party sought to be bound thereby must either have imparted to them actual knowledge of its existence, or it must be a usage so general and well-known in the community as to give rise to the presumption of such knowledge. National Bank v. Burkhardt, 100 U. S. 691, 25 L. Ed. 766; Moore v. United States, 196 U. S. 166, 25 Sup. Ct. 202, 49 L. Ed. 428. The evidence wholly fails to meet these requirements. In the first place, no local custom was shown. The evidence on behalf of defendant in that regard tended to show that the custom with the banks of Sacramento was the same as existed all over the country. In other words, that it was not a

local custom at all. The custom throughout the country is controlled by the courts of the various states; and the decisions of the courts of the different states show that no such general custom prevails.

In the next place, if the custom testified to be regarded as a local one, there is no evidence that plaintiff was apprised of its existence.

[5] All that was stated to plaintiff by the defendant's cashier that could be construed as bearing on the subject was what has been stated above. There was absolutely nothing in this to advertise to plaintiff that the defendant was referring to any custom, local or otherwise, to affect her rights, or was making a contract with her restricted by any such usage. Very clearly the evidence as to the existence of a custom was not sufficient to bring knowledge of it directly home to plaintiff, nor to give rise to any presumption of knowledge of its existence on her part.

Moreover, under the interpretation put by the law upon the contract the defendant made, and there being no special feature or stipulation shown limiting the effect of that contract or defendant's liability thereunder, there is really no place for a custom in this case. As was said in National Bank v. Burkhardt, supra:

"These considerations apply to the posture of the case as it was found to be by the verdict of the jury, under instructions, properly given, by the court. According to those tests, the contract was clear, complete, and irrevocable when the check was delivered by one party and received by the other. After that there was nothing left for usage to do. Its aid, when the controversy arose, was invoked too late. If the bank proposed to hold the check on conditions, it was but fair and just to the other party to have said so when it was received, and thus have given him the option, after such notice, to do with it as he might think proper."

See, also, Allen v. St. Louis Bank, 120 U. S. 20, 39, 7 Sup. Ct. 460, 30 L. Ed. 573.

[6] While a custom may be resorted to, to explain a doubtful or ambiguous contract, it will not be admitted to vary or contradict the terms of an express contract. No usage can change the plain meaning of a contract. Withers v. Moore, 140 Cal. 591, 74 Pac. 159; Laver v. Hotaling (Cal.) 46 Pac. 1070; Dingley v. McDonald, 124 Cal. 682, 57 Pac. 574.

The other matters suggested are, I think, sufficiently covered by what has been said, and need not be specially noticed.

Judgment will have to go for plaintiff as prayed; and it is so ordered.