EXCHANGE NATIONAL BANK *v.* LITTLE.

Opinion delivered February 2, 1914.

1. APPEAL—APPEALS FROM CHANCERY—PRACTICE.—It is the practice of the Supreme Court to try chancery cases *de novo* on the record made in the court below. (Page 269.)

2. BILLS AND NOTES—MATERIAL ALTERATION—EFFECT.—The adding of the words "with ten per cent interest per annum from date," to a note after its execution, and without the consent of the maker, is a material alteration, and avoids the note even in the hands of a holder before maturity, for a valuable consideration and without notice of the forgery. (Page 269.)

3. BILLS AND NOTES—BONA FIDE HOLDER.—One who takes negotiable paper before maturity as security for a debt, without notice of any defects, receives it in due course, and is a *bona fide* holder. (Page 270.)

4. BILLS AND NOTES—CUSTOMS AND USAGES—NOTICE OF.—Appellant bank took a note from E. with collateral notes executed by appellees as securities. E. collected the notes from appellees without the knowledge of appellant. *Held*, where the custom in the place where E. lived to collect collateral notes, was not known to appellant, and where E. made the collection without appellant's knowledge or consent, appellant is not bound by E's act, and may collect on the collateral notes from appellees. (Page 271.)

5. CUSTOMS AND USAGES—BINDING WHEN.—Particular usages and customs of trade or business must be known by the party to be affected by them, or they will not be binding, unless they are so notorious, universal or well established that his knowledge of them will be conclusively presumed. (Page 272.)

6. CONTRACTS—HOW AFFECTED BY LOCAL CUSTOMS.—Where the rights and liabilities of the parties to a contract are fixed by the general principles of the common law, they can not be changed by local customs of the place where the contract is made. (Page 272.)

Appeal from Lonoke Chancery Court; *John E. Martineau,* Chancellor; reversed in part and affirmed in part.

STATEMENT BY THE COURT.

Appellant brought three separate suits to foreclose chattel mortgages which had been executed by appellees

in favor of Eagle & Co. to secure certain notes. These notes had been transferred by endorsement by Eagle & Co. before maturity to appellant as collateral security for loans obtained by Eagle & Co. from appellant. Appellees set up- as a defense that they had paid the notes to Eagle & Co. and that appellant had constituted Eagle & Co. its agent for the collection of said notes. In the case against J. F. Little *et al.,* appellees set up as an additional defense that the notes sued on had been altered since execution and that appellant was not a *bona fide* purchaser for value.

The cases were consolidated and heard together upon the same evidence. The appellees introduced testimony which showed that they had paid their respective notes to Eagle & Co. but that at the time of payment they had not demanded that their notes be delivered up to them. T. J. Hudson, for appellees, testified:

I have resided in England, Arkansas, since 1889; was bookkeeper for Eagle & Co. about eleven years. The firm had been borrowing from twenty-five to thirty-five thousand dollars each year for five or six years from appellant. To secure these loans it had been the practice of Eagle to put up as collateral individual notes that he had taken from his various customers. Eagle & Co. did, a large mercantile business, and the bank would loan him about 75 per cent of the face value of the collateral notes. Prior to 1911 the firm had paid the bank promptly. I do not think the bank ever collected any of the notes which Eagle placed with it as collateral. The firm of Eagle & Co. collected them. R. E. L. Eagle constituted the firm, and in the fall of 1911 absconded. It had been the custom of Eagle & Co. to put up their customers' notes, collect those notes, and pay off the note the firm owed the bank. I believe that is the custom at the town of England. Hudson was asked the following question:

Q. Did the Exchange National Bank know from time to time for the last five or six years that you were

collecting these various notes placed with them as collateral security?  ·

A.   Yes, sir; they must have known it.   We put the notes up there.

On cross examination Hudson said:  We had been depositing customers' notes with appellant for several years and making collections of the notes.  We had no instructions from the bank authorizing us to collect the notes and just supposed we had authority to make the collections.  We just assumed authority to collect the notes and went ahead with the collections each season and nothing was said one way or the other by the bank.

J. P. Lipscomb testified:  I signed the note of J. F. Little and others for six hundred dollars, payable to Eagle & Co.  Mr. Little and his tenants went to Eagle to get him to furnish them, and Eagle told them he would furnish them if I would become responsible for them.  It was estimated that they would need supplies to the amount of six hundred dollars.  They gave Eagle a mortgage to secure this amount and executed their note for that amount to Eagle on the 17th day of ·January, 1911. I signed the note as surety and the note was for supplies to be furnished them during the year 1911.  When I signed the note, the words ''with 10 per cent interest per annum from date'' were not in the note, and have been put in there since the note was delivered to Eagle.  The note was not to bear interest because at that time no supplies had been furnished and nothing was then due Eagle.  The note has been paid in full to Eagle & Co., and there is nothing now due on it.

Hudson at first testified that he thought he wrote up the six hundred dollar note signed by Lipscomb and that the words ''with 10 per cent interest per annum from date'' were in the note when it was signed.  Subsequently he was recalled as a witness and said that he was mistaken in this statement.  He then testified that the words just quoted were placed in the note by Eagle after the note was executed and that they were placed there by him for the purpose of depositing the note with appel-

lant as collateral security. He stated that his handwriting was very similar to that of R. E. L. Eagle.

G. W. Morris testified: I am president of the Bank of England. It is the custom of that bank to look to the owner of the collateral notes for their collection. We hardly ever pay any attention to the notes. On cross examination he stated:

When parties borrow money from our bank we do not take collateral that is past due unless it is on real estate. We take the collateral notes to strengthen the note of the customer. When they put up collateral notes with us, we understand that we are the owner of the notes until our customers pay us. Usually it is the custom of our customers to collect these collateral notes, but we do not authorize them to appropriate the proceeds to their own use and do not authorize them to make a collection as our agent. To illustrate our practice: We will make a note to the St. Louis Union Trust Company and attach to that note as collateral, notes amounting to twenty thousand dollars. The makers of these notes are never notified by the Trust Company. The Trust Company notified our bank that our note is due, and we were usually notified to collect the amount. We usually notified the makers. It is the usual custom to notify the makers of the notes if we think our customer is going to collect our collateral note and hold the proceeds.

J. K. Brodie testified: In lending money to merchants in and around England, we require them to put up collateral notes as security for their loans unless we know that the other security is good. The custom of our bank is to expect the merchants to look after the collection of the collateral notes. For instance, our bank borrows money from the banks in St. Louis and Little Rock and deposits as security for our loans notes that have been placed with us as security for loans. The custom is for our bank to make the collection of these notes. The foreign banks know that we are making collection of such collateral notes as fall due before our note falls due; however, it is very rare that any of the collateral

falls due before our note does. The bank in St. Louis would notify us to collect such a note for them. That is also the manner of dealing with the Little Rock banks. On cross examination he stated:

If the customer borrowed five thousand dollars from us and placed with us ten thousand dollars collateral, we would permit him to collect the collateral if he would turn the money over to us, but we would not permit him to continue collecting the collateral until his note in favor of the bank fell due and thereby rely on him to come in and pay his note. Our position is simply this: We hold the collateral notes and are willing to surrender them when they are paid. We hold them until they are paid by some one. Until about three years ago, we did business with the appellant bank. In borrowing money from it, we would put up collateral notes. We followed our usual custom of putting up collateral notes that did not fall due after our note in favor of the bank for which the collateral was placed as security was due. It was very rare that one of the collateral notes would mature before our note in favor of the bank, but when such was the case the bank would usually send it to us for collection. We always paid our obligations promptly, and as a rule before they became due. Therefore, it was very rare that the bank ever sent us a collateral note for collection. They did not send us more than one or two a year.

The officers of appellant bank testified that they never gave any authority to Eagle & Co. to collect the notes which had been put up by that firm with appellant as collateral security. They said that if Eagle & Co. had ever exercised such authority, they did not know of it; that it was the rule that the collateral notes did not become due until after the note of Eagle & Co. to appellant bank was due; that they surrendered the collateral notes when the note they were given to secure was paid or when other notes were put up in the place of the collateral notes that were withdrawn; that there was no custom that obtained among banks to authorize the owner

of notes which had been put up as collateral to collect them; that if such practice prevailed, it would be useless to require notes put up as collateral security. They also testified that no such custom prevailed among banks in the city of Little Rock.

It was also shown in proof by appellees that about the 18th day of December, 1911, R. C. Wilkins went to England as the representative of the bank and while there it was made known to him that appellees had been paying their notes to Eagle & Co. and that Wilkins acquiesced in such practice. Wilkins testified for appellants and said that he went down there for the purpose of examining the property on which the Exchange National Bank held liens, which consisted of both real and personal property; that he did not go down there to make any collections, and had no authority whatever to make any settlements; that the only authority he had was to make an examination of the property to see whether or not it was there as described in the notes and mortgages held by the bank as collateral; that his only authority was to investigate and determine the value of the bank's collateral, and see that all of the property was there.

It was also shown that Wilkins' visit on this occasion was after R. E. L. Eagle had absconded and that no further payments were made by appellees after that date.

The chancellor dismissed the complaints for want of equity, and the cases are here on appeal.

*Moore, Smith & Moore* and *Geo. A. McConnell,* for appellant.

1. Appellant was a *bona fide* holder for value before maturity. 94 Ark. 387; 102 Ark. 45-9; 102 *Id.* 422; *Exch. N. Bank* v. *Steele,* June 30, 1913, 109 Ark. 107. A verdict should have been directed for the bank. *Ib.* Daniel on Neg. Inst. (4 ed.) ¶ 1230; 21 Ark. 393; 150 S. W. 411; 75 Ark. 170.

2. A custom in violation of a statute can not be set

up. But there is no sufficient evidence of such a custom. 106 Fed. 558; 89 Ark. 591; 80 *Id.* 601. A local custom can not change the rights and liabilities of parties to a contract fixed by law. 196 U. S. 157; 84 Ark. 389; 100 U. S. 686.

3. A custom must be reasonable. 29 A. & E. Enc. Law (2 ed.) 371, 376-7, 383-4; 19 Ark. 271; 20 *Id.* 251. A local custom is not binding in the absence of notice. 20 Ark. 251. A custom of three cities does not establish a general custom. 19 Ark. 271.

*Jas. B. Gray,* for appellees.

HART, J., (after stating the facts). In regard to the case against J. F. Little, J. T. Lipscomb *et al.,* the appellees alleged that the note was altered after it was delivered to Eagle & Co. and that therefore appellant is not an innocent purchaser for value. Counsel for appellant have not abstracted the testimony on this point, and state that the chancellor dismissed the complaint in this case for want of equity on other grounds. It is the practice of this court to try chancery cases *de novo* on the record made in the court below. It is true the original note in question is not here for our inspection, but Mr. Lipscomb testified positively that the words "with 10 per cent interest per annum from date" were added in the note after it was delivered to the payee, Eagle & Co. He further stated that the makers of the note did not, at the date of its execution, owe anything to Eagle & Co,, and that the note was given for supplies to be furnished by Eagle & Co. to the makers during the year 1911; that he signed the note as surety. The note bears date of January 17, 1911, and was payable to the order of Eagle & Co. on October 1, after date. The note was paid in full to Eagle & Co. in the fall of 1911. Mr. Hudson, the bookkeeper of Eagle & Co., first stated that the note was in his handwriting, but was later recalled as a witness and stated upon further reflection that the words "with 10 per cent interest from date" were in the handwriting of R. E. L. Eagle and were placed in the note after its execution by the makers thereof. Expert witnesses were

introduced by appellant, who testified that the note was in the handwriting of Hudson. We have not the note before us, and can only inspect the copy of it as shown by the record, but we think the testimony is sufficient to show that the note was altered after it was delivered to Eagle & Co. and that the makers of the note did not authorize the alteration made in it. In the case of *Fordyce* v *Kosminisky*, 49 Ark. 40, it was held that the alteration of negotiable paper after it has been signed and delivered to the payee, although done in such manner as to leave no mark or indication of the alteration observable by a man of ordinary prudence, avoids the check as to the drawer, even in the hands of one to ,whom it is negotiated before maturity for a valuable consideration and without notice of the forgery. The adding of the words "with 10 per cent interest per annum from date" was a material alteration in the note, and the finding of the chancellor that the complaint should be dismissed for want of equity was therefore correct.

In regard to the other cases, no such defense was made, and they are ruled by the case of the *Exchange National Bank* v. *Steele et al.,* 109 Ark. 107; 158 S. W. (Ark.) 969. In that case the court held that one who takes negotiable paper before maturity as security for a debt without notice of any defects receives it in due course and is a *bona fide* holder. The court further held that where the maker of a negotiable instrument pays the same to the payee, who is not the holder, he is not discharged from his obligation unless the payee was authorized by the holder to receive payment or the holder held out that he authorized such payment. In that case, under a state of facts in all essential respects similar to the facts proved in the case at bar, this court held that the trial court erred in not directing a verdict in favor of the holder of the note. In the present case, the officers of the appellant bank all testified that no authority was given to Eagle & Co. to collect the notes involved in this suit, and they had no knowledge that Eagle & Co. had been in the habit of collecting them. They said that the

collateral notes almost invariably fell due after the note of Eagle & Co. became due. That they never surrendered the collateral notes until the note of Eagle & Co. had been paid or until other notes were put up as collateral in their place. It is true that Hudson, the book-keeper of Eagle & Co., testified that it had been the custom of Eagle & Co. to collect the collateral notes and that the bank had knowledge of that fact; but when he was cross examined on the point he admitted that the bank had never given them authority to collect the notes and that the only reason that he stated that the bank knew they had been collecting them was the fact that they had done so. So it may be said that the decided preponderance of the evidence shows that the bank never gave Eagle & Co. authority to collect these collateral notes, and that it never had any knowledge that they were collecting them.

Again it may be said that the testimony was introduced by appellees tending to show that it was the custom of the banks at England to collect collateral notes which they had put up as collateral with banks in Little Rock and St. Louis, and that it was also their custom to permit merchants and other customers who had put up collateral notes with them to collect them when they fell due. But it will be noted that these witnesses on cross examination stated in each instance that the bank which held the collateral notified them to collect the notes. In these cases, then, it may be said that the fact that the bank collected the notes was not the result of custom, but was on account of being authorized to do so by the bank which held the collateral. One of these witnesses stated that his bank had formerly done business with the appellant bank, and that it was their custom to put up notes as collateral which fell due after its note to appellant's bank became due; that appellant bank had sometimes sent collateral notes to it to collect in rare instances where such collateral notes had fallen due before its note to appellant had become due. This testimony negatives the idea that it was the custom of appel-

lant bank to permit banks which had deposited notes for collateral security with it to collect the same. Therefore, we think that when the testimony is considered in all its bearings a preponderance of the evidence shows that there was no local custom permitting banks which had deposited notes as collateral security to collect the same.

Moreover, in the case of *Arkadelphia Lumber Company* v. *Henderson,* 84 Ark. 389, the court said: "Particular usages and customs of trade or business must be known by the party to be affected by them, or they will not be binding, unless they are so notorious, universal and well established that his knowledge of them will be conclusively presumed."

In the case of *J. J. Moore & Co.* v. *United States,* 196 U. S. 157, the court said:

Where the rights and liabilities of the parties to a contract are fixed by the general principles of the common law, they can not be changed by a local custom of the place where the contract is made.

There is no testimony in the record tending to show that appellant had notice of any such local custom on the part of the banks at England, or that it contracted with Eagle & Co. with reference to such custom. It follows that the decree of the chancellor dismissing the complaints in the cases of the *Exchange National Bank* v. *John Decent et al.* and *Exchange National Bank* v. *J. H. White et al.,* was erroneous and must be reversed with directions to enter a decree in favor of appellant. As above indicated, in the case of the *Exchange National Bank* v. *J. F. Little et al.,* the decree of the chancellor was correct, and it will be affirmed.