## MOORE *v.* UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 71.   Argued December 6, 1904.—Decided January 3, 1905.

Usage may be resorted to in order to make definite what is uncertain, clear up what is doubtful, or annex incidents, but not to vary or contradict the terms of a contract.

Under contracts between a San Francisco coal dealer and the United States for the delivery of coal at Honolulu "at wharf" or "on wharf as customary," the customs referred to held to be those of Honolulu and not of San

Francisco, and that the United States, in the absence of any provision to the contrary, could not be held liable for the demurrage paid by the shipper to the owners of vessels carrying the coal for delay in discharging their cargoes on account of the crowded condition of the harbor.

In engagements to furnish goods to a certain amount the quantity specified governs. Words like "about" and "more or less" are only for the purpose of providing against accidental and not material variations.

Under the contract in this case for delivery of "about" 5,000 tons of coal the United States cannot refuse to accept more than 4,634 tons, but is liable for the difference in value on 366 tons tendered and acceptance refused.

THE facts are stated in the opinion.

*Mr. L. T. Michener,* with whom *Mr. W. W. Dudley* was on the brief, for appellant:

As the agreement was prepared by the Government it will be construed most strongly against it. *Garrison* v. *United States,* 7 Wall. 688, 690; *Chambers* v. *United States,* 24 C. Cl. 387, 392; *Simpson & Co.* v. *United States,* 31 C. Cl. 217, 243; *Edgar & Thompson Works* v. *United States,* 34 C. Cl. 205, 219.

The Government was bound by the customs of the Port of San Francisco. 2 Parsons on Contract, side pp. 535, 539; *Robinson* v. *United States,* 13 Wall. 363, 366; *Hostetter* v. *Park,* 137 U. S. 30, 40; *Honge* v. *Woodruff,* 19 Fed. Rep. 136; *Smith* v. *60,000 feet of Lumber,* 2 Fed. Rep. 396; *Moody* v. *500,000 Laths,* 2 Fed. Rep. 607; *Pleasant* v. *Pendleton,* 6 Rand. (Va.) 493; *Barlow* v. *Lambert,* 28 Alabama, 704; *Foley* v. *Mason,* 6 Maryland, 37; *Van Hoesen* v. *Cameron,* 54 Michigan, 609; *McClusky* v. *Klosteman,* 20 Oregon, 108; *Lyon* v. *Culbertson,* 83 Illinois, 33; Maclachan on Mer. Ship. 360; Abbot on Ship. 228; Parsons on Ship. 324; *Barnard* v. *Kellogg,* 10 Wall. 390, distinguished. It is immaterial whether or not the officers and agents of the United States had knowledge of the custom. Phillips on Ins. §§ 980, 1003; *Thatcher* v. *McCulloch,* Olcott, 365; *Lowry* v. *Russell,* 8 Pick. 360; *McMasters* v. *Pa. R. R. Co.,* 60 Pa. St. 372; *Pittsburg Ins. Co.* v. *Dravo,* 2 Phil. W. N. C. 194; cases and authorities cited *supra.*

The facts proved as to the conditions at Honolulu do not

relieve defendant. *Williams* v. *Theobald,* 15 Fed. Rep. 468; citing *Randall* v. *Lynch,* 2 Camp. (N. P.) 352.

The parties having contracted in such a way as to fix the rate of discharge, it follows inevitably that local conditions at Honolulu could not relieve them from such contract stipulations.

If the shipper or freighter covenants to do a particular act, which it becomes impracticable for him to do, he must answer for his default. *Cross* v. *Beard,* 26 N. Y. 85; Abbott on Shipping, 307, 387; *Ford* v. *Cotesworth,* L. R. 4 Q. B. 127; *Williams* v. *Theobald,* 8 Sawyer, 443, 448; *Allen* v. *385 Tons of Coal,* 27 Fed. Rep. 316; 9 Am. & Eng. Ency. of Law, 223, 242.

Even if there were no contract at all concerning lay days or demurrage, the law will imply a contract that the ship shall be detained a reasonable time only, and that the ship shall have reasonable demurrage therefor. Maclachlan, 546; 1 Parsons Mar. Law, 152; 1 Leggett on Bills of Lading, 297.

The burden of getting wharf at Honolulu was on the Government and not on the shipper. 1 Parsons on Ship. 226; Porter on Bills of Lading, § 400; Oliver on Shipping, 77; Scrutton on Charter-parties, 90; *Stewart* v. *Rogerson,* 6 L. R. Com. Pl. 424; *Jacques* v. *Wilson,* 7 Times L. R. 119; *Tharsis Co.* v. *Morrell,* L. R. 2 Q. B. (1891,) 647, 652; *The Boston,* 1 Lowell, 464; *Manson* v. *Railroad Co.,* 26 Fed. Rep. 923; *Nelson* v. *Dahl,* 12 Ch. Div. 562; *Choate* v. *Meredith,* 1 Holmes, 500; *Moody* v. *500,000 Laths,* 2 Fed. Rep. 607; *Davis* v. *Wallace,* 3 Clifford, 133; *Thatcher* v. *Gas Light Co.,* 2 Lowell, 362; *Smith* v. *Lee,* 66 Fed. Rep. 344; *P. & R. R. R. Co.* v. *Northam,* 2 Ben. 1; *Reed* v. *Weld,* 6 Fed. Rep. 304.

If the wharves were all occupied the Government should have directed other delivery. *Williams* v. *Theobald,* 8 Sawyer, 443, 448; *Nelson* v. *Dahl,* 12 L. R. Ch. Div. 568; *Ford* v. *Colesworth,* L. R. 4 Q. B. 127; *Cross* v. *Beard,* 26 N. Y. 85; *Allen* v. *385 Tons of Coal,* 27 Fed. Rep. 316.

In the absence of any express agreement as to the time for unloading, the law implies a contract to unload within a rea-

sonable time, and if the charterer or consignee fails to do so, through his own fault or that of his agent, he is liable for damages in the nature of demurrage for the detention of the vessel. 9 Am. & Eng. Ency. of Law, 253, n. 3; *Melloy* v. *Lehigh Co.,* 37 Fed. Rep. 377; *Sprague* v. *West,* Abb. Admr. 548, 553; *Bacon* v. *Transp. Co.,* 3 Fed. Rep. 344; *Hangood* v. *Tons of Coal,* 21 Fed. Rep. 681; *Crawford* v. *Mellor,* 1 Fed. Rep. 638; *Hyperion's Cargo,* 2 Lowell, 93; *The T. L. Adams,* 26 Fed. Rep. 655; *Empire Co.* v. *P. & R. R. R. Co.,* 70 Fed. Rep. 263; *S. C.,* affirmed 77 Fed. Rep. 919; *Randall* v. *Sprigg,* 74 Fed. Rep. 247; *Hoxie* v. *Reuben Doub,* 46 Fed. Rep. 800.

The Government having accepted the cargoes as consignee is liable the same as if it had been the charterer or party to the bill of lading. 1 Parsons Ship. 312; *Sutton* v. *Housatonic R. R. Co.,* 45 Fed. Rep. 507; *N. German Lloyd* v. *Heule,* 44 Fed. Rep. 100; *Neilson* v. *Jesup,* 30 Fed. Rep. 138; *The Thames,* 14 Wall. 98, 107; *Gates* v. *Ryan,* 37 Fed. Rep. 154.

The authorities established that the Government is liable as consignee for the demurrage paid by the charterer to the shipowner. Cases cited *supra* and *The Rebecca J. Moulton,* 5 Dec. of Comptroller, 305; *275 Tons of Phosphates,* 9 Fed. Rep. 209; *Young* v. *140,000 Bricks,* 78 Fed. Rep. 149; *Falkenberg* v. *Clark,* 11 R. I. 278; Abb. on Ship. 306; 1 Kay on Shipmaster & Seaman, 151; *Jesson* v. *Solly,* 4 Taunton, 52; *Mitchell* v. *Langdon,* 10 Biss. 527; *Wright* v. *New Zealand Co.,* L. R. 4 Exch. Div. 165, 170; *Tillett* v. *Com. Avon Wks.,* 2 Times Law Rep. 675; Carver on Carriage by Sea, §§ 644, 712.

As to the true rule of interpretation of. "more or less" "about," "say," and equivalents, see *Brawley's Case,* 11 C. Cl. 522; *S. C.,* affirmed 96 U. S. 168, 173, and *Norrington* v. *Wright,* 115 U. S. 188.

*Mr. Special Attorney Philip M. Ashford,* with whom *Mr. Assistant Attorney General Pradt* was on the brief, for the United States:

The contracts are silent as to the carriage of the coal which

was to be delivered on the wharf at Honolulu. The agent of the United States had no knowledge of the customs of San Francisco. If any customs controlled they would be those of Honolulu and not of San Francisco. Carver on Carriage by Sea, § 461. The liability of the United States was only that of consignee. 9 Am. & Eng. Ency. of Law, 2d ed., 229, 257.

Where the vessel arriving is obliged either by custom of the port or bill of lading to await its turn in discharging the consignee is not liable for demurrage caused by the harbor being overcrowded. *Owen* v. *49,774 Bushels of Rye*, 54 Fed. Rep. 185; *Riley* v. *Cargo of Iron Pipes*, 40 Fed. Rep. 605; *Cross* v. *Beard*, 26 N. Y. 85; *Wordin* v. *Bemis*, 32 Connecticut, 268; *The Glover*, 1 Brown, Adml. 166; *Clendaniel* v. *Tuckerman*, 17 Barb. 184; *Towle* v. *Kettell*, 5 Cush. 18; *Weaver* v. *Walton*, 5 Chi. Leg. N. 125; Abbs. Ship. 311; *Fulton* v. *Blake*, 5 Biss. 371; *Rodgers* v. *Forresters*, 2 Camp. 483; *Burmaster* v. *Hodgson*, 2 Camp. 488; *The M. S. Bacon*, 3 Fed. Rep. 344; *Coombs* v. *Nolan*, 7 Ben. 301; *Velatty* v. *Curtis*, 41 Fed. Rep. 479; *The Elida*, 31 Fed. Rep. 420; *The Mary Riley* v. *3,000 Railroad Ties*, 38 Fed. Rep. 254; *Empire Transp. Co.* v. *P. & R. C. & I. Co.*, 77 Fed. Rep. 919; *Smith* v. *Granite Paving Co.*, 56 Fed. Rep. 525.

Where the consignee is not bound by the contract to furnish a berth (and the consignee in this case certainly was not), and where the vessel is required to take its turn in unloading (the vessels in this case certainly were), he is not liable for delay caused by an extraordinary accumulation of vessels to be unloaded. Such is the principle to be gleaned from the authorities heretofore cited. Reasonableness is all that is required of the consignee with reference to the receipt and disposal of a cargo in all shipping contracts, and as we have before stated, where the charter party or the bill of lading is silent as to the matters in dispute here, reasonable conduct only is required. *Whiteside* v. *Halstead*, 90 Illinois, 95; *Elten* v. *Newton*, 134 N. Y. 143; *Dayton* v. *Park*, 142 N. Y. 391; 9 Am. & Eng. Ency. of

Law, 2d ed., 255; Carver's Carriage by Sea, § 736; 7 Comp. Dec. 573; 2 Parsons, 423.

No particular wharf was designated, but it was specifically and definitely stated in the contract that the coal should be delivered at *a* wharf in the port of Honolulu and the facts found show that only one of three places at said port would conform to this requirement. To one of these places the ships in question must con.̇ before "lay days" would commence to run, and the United States as consignee was not liable for delays to the ships in coming to such place or places caused by their occupation by other ships.

So it seems clear that the "lay days" provided for said vessels should not be·held to begin to run against the United States until after the arrival of the vessels in question at the wharf. *Bereton* v. *Chapman*, 5 Moo. P. 526; *Bremner* v. *Bunell*, 4 Sess. Cass. 934.

As to definition of "about," see Benj. on Sales, § 691; 96 U. S. 168, 171, 172; 115 U. S. 189, 204; 57 N. Y. Super. Ct. 57; 54 Maryland, 187; 7 Ind. App. 462, 467; 5 Gray (Mass.), 589; 6 El. & Bl. 675, 678; 2 Camp. 56; L. R. 5; P. C. 203, 217; 1 P. C. Div. 155, 158.

It is only a question of whether or not, under the circumstances surrounding this particular case, the delivery of 4,634 tons of coal was the delivery of "about 5,000 tons" of coal. It seems clear that it was.

Mr. Justice McKenna delivered the opinion of the court.

The appellant is a general commission merchant and shipper at San Francisco. He filed his petition in the Court of Claims, consisting of two paragraphs, in the first of which he claimed reimbursement from the United States of the sum of $1,053.36, demurrage paid by him for the detention over lay days of two ships chartered by him to transport coals to Honolulu and there to be delivered to the United States. By the second paragraph he prayed the recovery of the sum of $1,120.87, the

difference between the contract price of 366 tons of coal, which the United States refused to receive, and the price obtained for the same upon the sale in open market.

The causes of action rested on two contracts entered into by appellant with the United States through the proper officer of the Quartermaster's Department, United States Army, by which appellant agreed to furnish and deliver to that Department, Honolulu, Hawaiian Islands, "*at the wharf*," about 3,900 tons of the best merchantable "Wallsend" Australian steam coal, at the rate of not less than 100 tons a day, at 2,240 pounds to the ton, dangers of the sea and any causes beyond appellant's control excepted, the deliveries to commence on the arrival of the Hawaiian ship Euterpe at Honolulu, on or about July 23, 1898, for and in consideration of which appellant was to be paid at the office of the Quartermaster, United States Army, at San Francisco, California, at the rate of $9 per ton, in gold coin of the United States.

And by the second contract appellant was to deliver "on wharf, as customary," about 5,000 tons of the best merchantable Australian, Seaham, Wallsend or Pacific Coöperative steam coal, deliveries to commence at Honolulu on or about October 1, 1898. The other facts were found by the Court of Claims, as follows:

"III. That at the respective times these contracts were made it was the custom at San Francisco, between shippers and ship-owners to insert in their charter parties a stipulation to the effect that cargoes were to be discharged as customary, in such customary berth or place as consignee shall direct, ship being always afloat, and at an average specified number of tons per weather working days (Sundays and holidays excepted), to commence when ship is ready to discharge, and notice thereof has been given by the captain in writing, and if detained over and above the said laying days, demurrage to be at 4d. register ton per day, which stipulation was duly inserted in the contract of the claimant with the ships employed by him to transport the coal mentioned in the contracts. It does not appear

that the officers and agents of the defendant, who were authorized to make, and did make, the contracts for the defendant, had knowledge or notice of such custom, nor that the contracts or either of them were made in view of such custom.

"IV. The claimant [appellant] discharged his said contracts as follows: The first contract: By the arrival at Honolulu of the ship Euterpe with 1,543 tons of coal, July 31, 1898, which was placed in berth at the wharf by the harbormaster of said port August 8, 1898, at 2.15 P. M., and commenced discharging coal at 3 P. M. same day, and finished August 29, 1898, consuming eighteen working days. If she had been discharged at not less than 100 tons per day, the time consumed would have been sixteen days. It does not appear that the defendant was at fault either in the loss of time in arriving at the wharf, nor in the discharge of the cargo afterwards. The court finds the defendant was able, ready and willing to receive the cargo as rapidly as discharged at the wharf. The claimant paid to the shipowner $1,053.36 demurrage for these delays.

"The second contract: 1. By the arrival of the bark Harvester, with 2,179 tons of coal, August 28, 1898, at Honolulu, which was placed at a berth at the wharf by the harbormaster September 16, 1898, and began discharging coal on that date, and completed same October 7, 1898, a period of eighteen working days. It does not appear that the defendant was at fault in the loss of time of said last-mentioned ship in arriving at the wharf. 2. By the arrival of the ship General Gordon at Honolulu, August 27, 1898, with 2,455 tons of coal. While at anchor, September 9, 10 and 11, 330 tons were discharged into steamship Arizona, a transport of defendant, for its own use, after which the Gordon was placed at a berth at the wharf by the harbormaster, September 14, at 1 P. M., and then commenced the further discharge of the cargo, completing the same October 4, no delays having occurred at the wharf. It does not appear the defendant was at fault in the ship's delay in reaching the wharf. In the case of each ship the defendants had notice in writing of their respective arriv-

als within twenty-four hours thereafter. The wharves at Honolulu are under the control of a harbormaster. The practice of such harbormaster was to assign ships to berths at the wharves in the order of their respective arrivals, and this practice was followed by him in respect to the ships mentioned. Claimant paid said shipowners for delays $1,433.12 to the Harvester and $744.48 to the General Gordon. All coal delivered was paid for by defendant.

"V. The coal actually delivered under the second contract was 4,634 tons, completed October 7, 1898. About a month subsequent to this claimant purchased 366 tons of coal of the barkentine Omega, then in the Honolulu harbor, and tendered the same to the defendant upon its contract of June 23, 1898, but the defendant refused to receive it, whereupon claimant sold the same in market, for the best price he could obtain, at $3.06¼ per ton less than $9, the contract price with the defendant, equivalent to $1,120.87 in all, and to his loss in that amount.

"VI. At the time of the delivery of the coal mentioned in the foregoing findings the Honolulu harbor had eleven docks or wharves, three of which only were used for the discharge of coal. The docks were crowded, and several vessels were moored at the reef. By local regulations of the Government, a harbormaster had general supervision of all vessels in the harbor, and all vessels were anchored and assigned to berths, in the order of their arrival, by the harbormaster. There were no lighters for public use, and defendant had none at the port, and it was usual or customary to discharge freight upon the wharves. The defendant had no authority over the wharves, and was subject to local regulations, and the order of the harbormaster, the same as individuals."

As a conclusion of law the court decided that appellant was not entitled to recover. 38 C. Cl. 590.

The question in the case is whether the delay at Honolulu in the delivery of the coal was caused by the United States or by appellant; or, in other words, whether it was the duty of

the United States to designate and furnish a wharf for the discharge of the coal from the ships, or its duty only to receive the coal at the wharf when delivered there by appellant.

The question is one of law. Any fault in fact upon the part of the United States is excluded by the findings of the court. The cause of delay is expressly found to have been due to the conditions in Honolulu harbor, and that to these conditions the United States was as subordinate and subject as appellant. The liability of the United States is asserted, nevertheless, on account of the custom existing in San Francisco between shippers and shipowners.

But the terms of the contracts are explicitly opposite to the custom. The custom requires a consignee to designate a berth for the discharge of cargo, and is hence responsible, it is contended, for the delays to a ship in reaching the berth, though caused by the conditions existing at the port of discharge. The contracts have no such provision, nor do they refer to the charter parties entered into between claimant and the ships. The contracts require delivery to be "at wharf" (first contract); "*on wharf as customary*" (second contract). "As customary" meant the mode of discharging freight at Honolulu. Carver, Carriage by Sea, 696. The custom there was to discharge freight upon the wharves. The terms of the contracts, therefore, are reinforced by the custom at Honolulu, and the custom at San Francisco cannot prevail against them.

The effect of usage upon the contracts of parties has been decided many times. It may be resorted to in order to make definite what is uncertain, clear up what is doubtful, or annex incidents, but not to vary or contradict the terms of a contract. Various applications of this principle are presented in the following cases: *Barnard* v. *Kellogg*, 10 Wall. 383; *Hearne* v. *Marine Ins. Co.*, 20 Wall. 488; *The Insurance Companies* v. *Wright*, 1 Wall. 456; *Oelricks* v. *Ford*, 23 How. 49; *Hostetter* v. *Park*, 137 U. S. 30; *National Bank* v. *Burkhardt*, 100 U. S. 686. We do not think it is necessary to make a detailed review of these cases or of the cases which appellant has cited in which

consignees have been charged with demurrage. To trace and relate the various conditions upon which consignees have been held liable would extend this opinion to too great length, and discuss matters irrelevant to the case as we regard it. In all of the cases cited there was an omission of duty on the part of the consignees. In the case at bar there was no omission of duty, and, besides, the United States was not a consignee of the coal in any proper sense of that word. There was no privity between it and the ships. Its contract was to receive coal at the wharf and pay for it on delivery there, after inspection. Its contract was not to receive coal in lighters or to bear any expense in the transportation to the wharves. It is manifest that coal on board ships in a harbor is not in the same situation as coal on a wharf. The wharf, under the contract, was the place of destination, and the appellant took the chances, as observed by the Court of Claims, of obstacles which should intervene to delay the delivery of the coal at the wharf, as they did of other obstacles which might have intervened to prevent the coal reaching the harbor. It was not strictly the coal in the ships that the United States contracted to take. It was certain quantities of coal, and on account of this, in the exercise of their rights under the second contract, appellant bought coal in the open market and tendered it in fulfillment of that contract. The liability of the United States to accept we shall presently consider. We cite the fact now as illustrating the meaning of the contract. It is manifest from these views the Court of Claims was right in holding the United States was not liable for the delay caused to the ships by the conditions which existed in Honolulu harbor.

2. By the terms of the second contract (June 23, 1898) the appellant agreed to deliver and the United States agreed to "receive about 5,000 tons" of coal, delivery to commence with about 2,200 tons, to arrive at Honolulu on or about the first day of October, 1898. By the seventh of October delivery was made of 4,634 tons. About a month subsequently appellant purchased 366 tons of coal of a ship then in the harbor; .

and tendered the coal to the United States in fulfillment of the contract to deliver 5,000 tons. The United States refused to receive it, and appellant sold it in the open market for $3.06¼ per ton less than $9, the contract price. This was the best price which could be obtained, and the loss to appellant was $1,120.87. The Court of Claims held that the appellant was not entitled to recover. We think this was error. The obligations of parties were reciprocal; one to deliver, the other to receive, about 5,000 tons of coal, and equally reciprocal is the liability for non-performance of the obligations. The only question can be, is 366 tons less than 5,000 tons, "about 5,000 tons"? We think not. The difference is too great. We said in *Brawley* v. *United States*, 96 U. S. 168, 172, that in engagements to furnish goods to a certain amount, the quantity specified is material and governs the contract. "The addition of the qualifying words 'about,' 'more or less,' and the like, in such cases, is only for the purpose of providing against accidental variations arising from slight and unimportant excesses or deficiencies in number, measure or weight." See also *Cabot* v. *Winsor*, 1 Allen, 546, 550; *Salmon* v. *Boykin*, 66 Maryland, 541; *Indianapolis Cabinet Co.* v. *Herrman*, 7 Ind. App. 462; *Cross* v. *Eglin*, 2 Barn. & Adol. 106; *Morris* v. *Levison*, 1 C. P. D. 155, 158; *Bourne* v. *Seymour*, 16 C. B. 337, 353; *Simpson* v. *N. Y., N. H. & H. R. R. Co.*, 38 N. Y. Supp. 341, 342.

The record does not inform us why the United States refused the tender, and we must assume that it had no other justification than its supposed right under the contract.

*Judgment reversed and cause remanded with directions to enter judgment for appellant (claimant) in the sum of $1,120.87.*

MR. JUSTICE HOLMES concurs in the result.