## ROCKY MOUNTAIN FUEL CO. v. CONSOLIDATED COAL & COKE CO.

(Circuit Court of Appeals, Eighth Circuit. November 5, 1921.)

No. 5699.

**1. Appeal and error ⬅254—Ruling on demurrer reviewable without an exception.**

The ruling of a District Court on demurrer to a complaint is reviewable by the Circuit Court of Appeals without an exception.

**2. Sales ⬅71(4)—Contract held to be for sale and purchase of entire product of coal mine during its term.**

A contract between a coal mining company and a company dealing in coal construed, and *held* to be one for the sale and purchase of the entire product of a mine during its term, with certain stated exceptions.

**3. Sales ⬅176(1)—Seller held not to have waived right to sue for breach of contract.**

Under a contract for the sale by plaintiff and the purchase by defendant of the entire product of a coal mine during a term of years, a provision that defendant should, "as nearly as possible," order and take a stated quantity in each of the calendar months of each year, *held* to relate to the manner of performance, and plaintiff *held* not to have waived the right to sue for a breach of the contract because it did not declare a violation at the time defendant first failed to take the quantity specified for a particular month.

In Error to the District Court of the United States for the District of Colorado; Robert E. Lewis, Judge.

Action at law by the Consolidated Coal & Coke Company against the Rocky Mountain Fuel Company. Judgment for plaintiff, and defendant brings error. Affirmed.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

N. Walter Dixon and Harry S. Silverstein, both of Denver, Colo. (Jesse G. Northcutt, of Denver, Colo., on the brief), for plaintiff in error.

Charles W. Waterman, of Denver, Colo. (William A. Jackson, of Denver, Colo., on the brief), for defendant in error.

Before CARLAND, Circuit Judge, and YOUMANS and JOHNSON, District Judges.

YOUMANS, District Judge. This was a suit by defendant in error against the plaintiff in error for damages for failure to purchase coal, the output of a mine belonging to defendant in error, according to the terms of a contract entered into between the parties, which contract reads as follows:

"This agreement, made and entered into this 12th day of August, A. D. 1914, by and between the Consolidated Coal & Coke Company, a corporation organized and existing under and by virtue of the laws of the state of Colorado, of the first part, and hereinafter designated the Consolidated Company, and the Rocky Mountain Fuel Company, a corporation organized and existing under and by virtue of the laws of the state of Wyoming, and duly authorized to do business in the state of Colorado, of the second part, and hereinafter designated the Fuel Company, Witnesseth that

"Whereas, the Consolidated Company is now operating and will continue during the term hereof to operate the certain coal mine, known as and called the Baum mine, in the county of Weld and state of Colorado, and is desirous of selling the output of said mine; and

"Whereas, the Fuel Company is engaged in the business of selling coal in the state of Colorado and elsewhere, and is desirous of purchasing the output of said Baum mine:

"Now, therefore, this agreement, and in consideration of the payments, covenants, and agreements to be made, kept, and performed by the respective parties hereto as herein provided, and in consideration of the sum of one dollar ($1.00) in hand paid by the Fuel Company to the Consolidated Company, the receipt whereof is hereby acknowledged, the Consolidated Company covenants and agrees to sell and deliver to the Fuel Company, free on board the railroad cars at said Baum mine, and the Fuel Company covenants and agrees to buy from the Consolidated Company, all of the coal (except as hereinafter provided) produced from the said Baum mine during the period of five (5) years from and after the 15th day of August, A. D. 1914, and to and until the expiration of the 15th day of August, A. D. 1919, upon and subject to the following terms, conditions, covenants, and agreements, to wit:

"1. Of the coal mined and produced from said Baum mine during the term hereof, the Consolidated Company covenants and agrees to sell and deliver all thereof to the Fuel Company, at the prices herein specified, except as follows, to wit:

"(A) Such of said coal as said Consolidated Company may use for steam purposes at said Baum mine, and such thereof as it may sell to its employés only at said mine; and

"(B) Such of said coal as said Consolidated Company may be required to deliver to the Post Printing & Publishing Company, under its existing contract to deliver to said Publishing Company such coal as it may require for its trade, which contract, it is understood and agreed, will expire on September 8, A. D. 1914, and for the performance of which contract the Fuel Company shall in no wise be responsible; and

"(C) Such of said coal as said Consolidated Company may be required to deliver to the Denver Gas & Electric Light Company, under its existing contract to deliver to said the Denver Gas & Electric Light Company slack and run of mine coal for its needs, which said contract will expire May 15, A. D.

1916, and for the performance of which contract it is agreed the Fuel Company shall in no wise be responsible. But it is expressly agreed that, if the Fuel Company shall so elect, and if the consent of the Denver Gas & Electric Light Company can be obtained thereto, said Consolidated Company will, upon demand, assign and transfer said contract to the Fuel Company, in which event the said tonnage shall not be excepted from the contract.

"2. The Consolidated Company shall, at all times during the term hereof, operate said Baum mine and produce coal therefrom to the capacity of said mine, to wit, one hundred and twenty-five thousand tons of coal, including slack, lump, and run of mine coal, during each and every current year of the term hereof.

"3. Of the said one hundred and twenty-five thousand (125,000) tons of coal to be by said Consolidated Company produced from said Baum mine during each current year of the term hereof, the Fuel Company shall purchase all thereof, except as provided in paragraph 1 hereof, and shall pay therefor to the Consolidated Company the following prices, to wit:

"(A) Sixty cents (60¢) for each and every ton of 2,000 pounds of slack coal sold and delivered unto it free on board the railroad cars at said Baum mine by said Consolidated Company during the term hereof;

"(B) One dollar and sixty-two and three-fourths cents ($1.6275) for each and every ton of 2,000 pounds of run of mine coal, and two dollars and seventeen and one-half cents ($2.175) for each and every ton of 2,000 pounds of lump coal, sold and delivered unto it free on board the railroad cars at said Baum mine by said Consolidated Company during the period from and after the date hereof and to and until the 15th day of May, A. D. 1916; and

"(C) One dollar and sixty-four and one-half cents ($1.645) for each and every ton of run of mine coal, and two dollars and twenty cents ($2.20) for each and every ton of lump coal, sold and delivered unto it free on board the railroad cars at said Baum mine by said Consolidated Company during the period from and after the 15th day of May, A. D. 1916, and to and until the expiration of the 15th day of August, A. D. 1919.

"In the event, however, that said Consolidated Company shall mine and produce from said Baum mine more than said 125,000 tons of coal, including slack, lump, and run of mine, during any current year of the term hereof, it shall, if said Fuel Company shall have a market therefor and shall order the same, sell and deliver to the Fuel Company such additional tonnage, at the respective prices above mentioned; but if said Fuel Company shall not order the same, as hereinafter more particularly provided, said Consolidated Company shall then sell and deliver said additional tonnage to the Fuel Company, and said Fuel Company shall purchase the same from said Consolidated Company, at the following prices per ton of 2,000 pounds for slack, lump, and run of mine coal, to wit:

"Thirty cents (30¢) for slack, one dollar and ten cents (1.10) for lump, and eighty-five cents (85¢) for run of mine.

"It is expressly agreed, however, that in the event the cost of producing coal in the Northern Colorado coal fields be either increased or decreased by reason of an increase or a decrease in the scale of wages now paid at the mines, made by and affecting both the Fuel Company and the Consolidated Company at their mines in the Northern Colorado coal fields and ———, then and in any such an event, the respective prices to be paid by the Fuel Company to the Consolidated Company for coal as above provided shall either be increased or decreased, as the case may be, according as such increase or decrease in the scale of wages shall, by computations arrived at as nearly as may be possible, either increase or decrease the cost per ton of producing coal in the said Northern Colorado coal fields.

"And it is also stipulated and agreed that the Consolidated Company shall not be required hereunder to deliver to the Fuel Company any run of mine coal until after June 1, A. D. 1916, unless it shall elect, upon the order of the Fuel Company, so to do.

"4. Of the said 125,000 tons of coal, including slack, lump. and run of mine, to be by the said Consolidated Company mined and produced from said

Baum mine during each and every current year of the term hereof, and all of which, except as provided in paragraph 1 hereof, said Consolidated Company shall sell and deliver to the Fuel Company as herein provided, the Fuel Company shall not be required hereunder to receive and purchase more thereof during any current month of the term hereof than as follows, to wit:

During August of any year not more than..................... 4,500 tons
During September of any year not more than................ 9,500 "
During October of any year not more than..................16,000 "
During November of any year not more than................18,000 "
During December of any year not more than................17,000 "
During January of any year not more than.................17,500 "
During February of any year not more than................13,500 "
During March of any year not more than....................13,500 "
During April of any year not more than.................... 6,250 "
During May of any year not more than...................... 4,000 "
During June of any year not more than..................... 2,500 "
During July of any year not more than..................... 2,750 "

"5. The coal to be purchased hereunder by the Fuel Company from the Consolidated Company shall be loaded, shipped, and consigned by the Consolidated Company only upon the order of the Fuel Company and in the manner as by it directed, but the Fuel Company agrees that it will, as nearly as possible, purchase coal each calendar month as above specified, and will /use its best endeavors to order coal, in a sufficient amount every day (except Sundays and holidays) of each current month, so as, as nearly as possible, to permit said Consolidated Company to deliver the tonnage of coal mentioned in paragraph 4 hereof, during each current month of the term hereof (it being expressly understood and agreed, however, that the tonnage of coal used by said Consolidated Company at its said Baum mine for steam purposes, and sold by it to its employés only, and delivered by it under the particular contracts, as provided in paragraph 1 hereof, shall be included as a part of the said stipulated monthly tonnages) ; and the Fuel Company further agrees that it will use its best endeavors to market said coal to be produced from said Baum mine in the monthly proportions above stated, during the entire twelve months of each current year of the term hereof. It is understood, however, that the greatest demand for lignite coal of the kind produced from said Baum mine occurs during the months of October, November, December, and January of each year. The Consolidated Company therefore agrees that if the Fuel Company shall require a larger amount of coal during any one of the said months, or during other month than is specified in paragraph 4 hereof, it will, if said Fuel Company shall order same, and notwithstanding the capacity of said Baum mine does not exceed 125,000 tons per year, use its best efforts to produce, if possible, such greater tonnage, and if mined will deliver same to the Fuel Company on its orders to meet such demand. The Fuel Company further agrees that it will, on each and every day of the life of this contract (Sundays and holidays excepted), notify said Consolidated Company of the amount of coal the Fuel Company will require from said Baum mine for the following day, and that it will also instruct said Consolidated Company concerning the consigning, and billing thereof, and the Consolidated Company agrees that it will furnish to the Fuel Company each and every day during the life of this contract a statement or duplicate copies, as the Fuel Company may require, of the billing of the said coal shipped from said Baum mine at the orders and directions of the Fuel Company.

"6. The Consolidated Company agrees that the coal delivered by it under this contract shall be carefully mined, and shall be reasonably free from dirt, slate, 'bone coal,' and other impurities, and shall be merchantable and marketable, and that the slack coal to be delivered hereunder shall be the usual, regular, and entire unselected product of the said Baum mine, which shall pass through shaking screens with holes therein not less than two inches in diameter, and that the lump coal to be furnished hereunder shall be the usual, regular, and entire unselected product of the said Baum mine, which shall

pass over shaking screens with holes therein not less than two inches in diameter, unless otherwise agreed by the parties hereto, and that the run of mine coal to be delivered hereunder shall be the usual, regular, and entire unselected product of said Baum mine. It is understood that the Fuel Company is purchasing said coal for the purpose of reselling it to its various customers, either at wholesale or retail, and hence, in all disputes arising out of claims, made by the customers of the Fuel Company on account of any of said coal containing an unreasonable amount of dirt, slate, 'bone coal,' or other impurities, or on account of the preparation of said coal, the Fuel Company shall adjust all such claims upon the best terms it may be able to arrange, and, if practicable, shall notify the Consolidated Company thereof, in order that it may be made a party to any such adjustment, and thereafter adjustments on account of any such claim shall be made between the parties hereto.

"7. The Fuel Company shall well and truly pay said Consolidated Company on the first day of each calendar month for all coal sold and delivered unto it pursuant hereto during the first fifteen days of the preceding calendar month, and on the fifteenth day of each calendar month for all coal sold and delivered unto it pursuant hereto during the period from the sixteenth day to the last day (both days inclusive) of the preceding month, unless either the first or the fifteenth day of any calendar month falls on a Sunday or a holiday, in which event the required payment shall become due on the day following such Sunday or holiday.

"8. In all settlements for coal sold by said Consolidated Company, and purchased by said Fuel Company pursuant hereto, the weights of coal as made at the mine under the supervision of the Western Weighing and Inspection Bureau weighmaster shall govern for all coal so weighed, and for all coal not weighed at the mine railroad weights shall govern.

"9. Any demurrage accruing upon any car or cars of coal ordered and directed to be loaded by the Fuel Company under this agreement shall be paid by the Fuel Company, but any demurrage accruing upon any car or cars of coal not specifically ordered to be loaded by the Fuel Company shall be paid by the Consolidated Company.

"10. If, during the life of this contract, the Consolidated Company shall be unable to furnish coal hereunder because of a strike or strikes of the laborers employed at said mine, or by reason of fires in, at, or about such mine, or for other causes beyond the reasonable control of said Consolidated Company, or by reason of a strike or strikes of any of the employés of the railroad or railroads engaged in transporting the product of said Baum mine therefrom, or by reason of any order issued by the United States government or by any official of the state of Colorado preventing said Consolidated Company from hiring men, or if at any time during the life of this contract the Fuel Company shall be unable to receive the coal from said Baum mine on account of a strike or strikes of any of the employés of the railroad or railroads engaged in transporting said coal therefrom, then, or in any such event, this contract shall stand suspended during any such time; and for such part of any current year of the term hereof during which any such conditions shall exist the Consolidated Fuel Company shall not be required to furnish, and the Fuel Company shall not be required to receive and purchase, any coal hereunder, any provision of this contract to the contrary notwithstanding.

"This agreement and the terms and conditions hereof shall result and inure to the benefit of, and shall be binding upon, the parties hereto and their respective successors and assigns.

"In witness whereof the parties hereto have caused these presents to be duly executed in duplicate the day and year first written above.

"The Consolidated Coal & Coke Company,
"[Seal.]                          By C. L. Baum, President.
"Attest: S. O. Dimm, Secretary.

"The Rocky Mountain Fuel Company,
"[Seal.]                          By D. W. Brown, President.
"Attest: J. V. Sickman, Secretary."

Upon written stipulation signed by the parties the case was tried to the court without the intervention of a jury. Judgment was rendered for defendant in error.

[1] Prior to the submission of the cause in this court defendant in error moved to dismiss the cause for the failure on the part of plaintiff in error to comply with rule 24 of this court (188 Fed. xvi, 109 C. C. A. xvi). The motion was denied, but the court ruled that there was no question open for consideration but the ruling on the demurrer to the complaint, which ruling could be considered without an exception, under the authority of Nalle v. Oyster, 230 U. S. 165, 33 Sup. Ct. 1043, 57 L. Ed. 1439, and Board of County Commissioners of the City and County of Denver v. Home Savings Bank, 236 U. S. 101, 35 Sup. Ct. 265, 59 L. Ed. 485.

[2] The only question, then, is whether the contract set out in the complaint is sufficient in its terms to constitute a basis for recovery of damages for the failure of the Fuel Company to purchase coal from the Consolidated Company. The contention of the Fuel Company is, first, that by the terms of the contract it was required to purchase only such an amount of coal as it could sell; and, second, that the failure of the Consolidated Company to declare a violation of the contract at the time of the first monthly failure of the plaintiff in error to take the stipulated amount of coal for that month was a waiver of the right to declare such violation.

The instrument states specifically that the Consolidated Company was at the time operating, and would, during the term of the contract, continue to operate, a certain coal mine, and that it was desirous of selling the output of such mine. This recital is followed by another to the effect that the Fuel Company was engaged in the business of selling coal in the state of Colorado and elsewhere, and was desirous of purchasing the output of the Consolidated Company's mine. The status of producer and purchaser was thus fixed.

The next paragraph of the instrument recites that the Consolidated Company covenants and agrees to sell and deliver to the Fuel Company all of the coal, with certain exceptions, produced from the mine in question during a period of five years from a fixed date. The instrument then proceeds to enumerate the exceptions. It then proceeds as follows:

"The Consolidated Company shall at all times during the term hereof operate said Baum mine and produce coal therefrom to the capacity of said mine, to wit, one hundred and twenty-five thousand tons of coal, including slack, lump, and run of mine coal, during each and every current year of the term hereof."

The Consolidated Company was by this provision required during the term of the contract to operate its mine and produce a certain quantity of coal each year.

[3] The next paragraph provides as follows:

"Of the said one hundred and twenty-five thousand (125,000) tons of coal to be by said Consolidated Company produced from said Baum mine during each current year of the term hereof, the Fuel Company shall purchase all thereof,

except as provided in paragraph 1 hereof, and shall pay therefor to the Consolidated Company the following prices, to wit."

Then follow the prices which should be paid for the coal thus purchased. The terms of the contract down to this point provide for the production and sale of 125,000 tons annually. The paragraph then provides for a production over and above that quantity as follows:

"In the event, however, that said Consolidated Company shall mine and produce from said Baum mine more than said 125,000 tons of coal, including slack, lump, and run of mine, during any current year of the term hereof, it shall, if said Fuel Company shall have a market therefor and shall order the same, sell and deliver to the Fuel Company such additional tonnage, at the respective prices above mentioned, but if said Fuel Company shall not order the same, as hereinafter more particularly provided, said Consolidated Company shall then sell and deliver said additional tonnage to the Fuel Company, and said Fuel Company shall purchase the same from said Consolidated Company, at the following prices per ton of 2,000 pounds for slack, lump and run of mine coal, to wit: Thirty cents (30¢) for slack, one dollar and ten cents ($1.10) for lump, and eighty-five cents (85¢) for run of mine."

The paragraph just quoted provides for the purchase by plaintiff in error of all of the coal produced by defendant in error over 125,-000 tons per year, the purchase of said coal to be dependent upon the ability of the Fuel Company to sell the same, and dependent also upon its order. If the Fuel Company ordered said excess, it was to pay the same price therefor that it paid for the 125,000 tons. If the Fuel Company did not order such excess, then the Consolidated Company was required to sell and deliver such excess at the prices named in the paragraph quoted.

The next paragraph of the contract reads as follows:

"The coal to be purchased hereunder by the Fuel Company from the Consolidated Company shall be loaded, shipped, and consigned by the Consolidated Company only upon the order of the Fuel Company and in the manner as by it directed, but the Fuel Company agrees that it will, as nearly as possible, purchase coal each calendar month as above specified, and will use its best endeavors to order coal, in a sufficient amount every day (except Sundays and holidays) of each current month, so as, as nearly as possible, to permit said Consolidated Company to deliver the tonnage of coal mentioned in paragraph 4 hereof, during each current month of the term hereof. * * *"

The portion of the contract last quoted clearly relates to the method of performance of the contract. The object plainly is to secure uniform operation of the mine during the period of the contract, the purpose being that the Consolidated Company might be advised and prepared to produce the required amount of coal and to guard against heavy orders at one period of the year, and no orders, perhaps, at another period of the year. This provision of the contract does not negative the former express provision by which the Consolidated Company, on the one hand, was required to produce coal to a fixed amount each year, and the Fuel Company was required to buy that coal each year.

The allegations of the complaint clearly show a breach of the contract, upon which an action could be maintained by the Consolidated Company. The failure of the Consolidated Company to declare a vio-

lation of the contract sooner than it did do so did not constitute a waiver on its part.

The case should be affirmed. And it is so ordered.