## NOTTINGHAM & WRENN CO. v. AMERICAN COAL EXPORTING CO., Inc.

District Court, S. D. New York. August 21, 1929.

984

Davis, Polk, Wardwell, Gardiner & Reed, of New York City (John W. Davis, Theodore Kiendl, and George M. Skinner, all of New York City, of counsel), for plaintiff.

Spitz & Bronberger, of New York City (Stanley W. Schaefer and Edgar R. Kraetzer, both of New York City, of counsel), for defendant.

THACHER, District Judge (after stating the facts as above). ■ If the agreement, the validity of which is now conceded, were to be construed in ignorance of the business to which it relates and the situation and necessities of the parties, one would say at once that the obligation expressed was to deliver coal actually produced from Monte Mines No. 1, No. 2, and No. 3. Indeed, the language is so plain that its normal meaning could hardly be made more clear. But words are creatures of their environment. They take color and sense from the transactions in which they are employed, and if truly understood are not always to be construed as the dictionaries define their common usage or the courts declare their legal significance, but rather in the sense in which men situated as the parties were, and concerned in like transactions, would have employed and understood them. And so it is that courts look not only to the face of the agreement but to its subject-matter and the surrounding circumstances so that they may understand the language of the parties and grasp the sense in which their words were used and the application they were intended to have to the business in hand. Nash v. Towne, 5 Wall. 689, 699, 18 L. Ed. 527; Bradley v. Steam-Packet Co., 13 Pet. 89, 99, 10 L. Ed. 72; Chicago, Rock Island & P. Ry. Co. v. Denver & Rio Grande R. Co., 143 U. S. 596, 609, 12 S. Ct. 479, 36 L. Ed. 277. Cardozo, J., writing for a majority of the court in Utica City Nat. Bank v. Gunn, 222 N. Y. 204, 118 N. E. 607, 608, said: "The proper legal meaning, * * * is not always the meaning of the parties. Surrounding circumstances may stamp upon a contract a popular or looser meaning." This, it seems, is such a case.

On May 19, 1920, plaintiff agreed with Logan-Pocahontas Fuel Company to purchase the output of three mines at Ottawa, in the state of West Virginia, known as "Monte No. 1," "Monte No. 2" and "Monte No. 3," for a stated period and subject to stated exceptions and conditions. Eight days later the agreement in suit was executed. Express reference was made to plaintiff's contract for the purchase of the output of these mines, as follows: "* * * The buyer

hereby purchases and agrees to receive and pay for and the seller hereby sells and agrees to ship from the coal which it may receive from Monte Mine #1, #2 and #3 of Buffalo-Thacker Coal Company, located near Ottawa, West Virginia, which coal it has purchased from Logan-Pocahontas Fuel Company under contract dated May 19th, 1920, and expiring March 31, 1921, the quantity and grade of coal hereinafter stated, upon the terms and subject to the conditions stated below. * * * "

Plaintiff's contract with Logan-Pocahontas Fuel Company contains the following provision: "*Grade:* Eagle Run-of-Mine coal to be mined and shipped from Monte Mines No. 1, No. 2 and No. 3, at Ottawa, West Virginia, eligible to pools 5 or 7, under classification B of the Tidewater Coal Exchange. The Seller agrees to give the coal shipped on this contract such standard preparation as will insure its passing the inspection of Newport News Coal Exchange." It was for the purchase of coal shipped to the piers at Newport News pursuant to the original contract with the mines that the agreement in suit was made.

The Monte Mines were located in the Kanawha District, on the Chesapeake & Ohio Railroad. Prior to May 1, 1920, all shipments on the Chesapeake & Ohio Railroad were consigned to the Tidewater Coal Exchange for the account of the transshipper. Coal from the Monte Mines was classified in Pools 5 and 7 of this exchange. The Tidewater Coal Exchange ceased operations on May 1, 1920, but on that day the Newport News Coal Exchange commenced operations substantially in the same way as the Tidewater Coal Exchange had operated. The new exchange adopted the classifications theretofore in use under the old exchange, and coal from Monte Mines continued to be classified in Pools 5 and 7. The coal was billed from the mine to the particular pool to which such mines were authorized to ship and was consigned to the exchange for account of the transshipper. As soon as the coal was shipped from the mine, the transshipper filed with the exchange a statement showing car numbers, date of shipment, and other details; was thereupon given a credit in the proper pool for the estimated amount of coal loaded in the cars, and was allowed to draw from the pool the amount of coal shown to his credit as soon as a vessel was ready to load, without awaiting arrival of the particular cars shipped from the mines. Under the rules and regulations of the exchange, shipments could only be made upon permits is-

sued upon satisfactory showing that vessels would be available to move the coal promptly. While the new exchange was a voluntary organization formed by the railroad for the benefit of all shippers to avoid congestion and eliminate delay, and membership was not compulsory, the fact is that from May 1, 1920, until the following spring all shippers over the Chesapeake & Ohio Railroad consigned all their coal to the Newport News Coal Exchange for the transshipper's account in the pool or pools in which it was classified. Prior to May 1, 1920, all such shipments were pooled in the Tidewater Coal Exchange in the same way. It is true that one large shipper whose coal was shipped in private cars was assigned a special pool for his cars only, but all other coal moving over this railroad went into the various pools, and thus lost its identity, to be delivered in kind from the pool in which it was classified. Every coal merchant knew from this uniform trade practice that specific coal shipped from a mine on the Chesapeake & Ohio Railroad would upon arrival at Tidewater lose its identity, and that delivery at the railroad piers would be made in kind. This was the situation with reference to which the parties contracted on May 19, 1920. The evidence shows that the purchaser at that time was only interested in receiving coal classified in Pools 5 and 7, and was entirely indifferent to the mines from which it was shipped. Both parties knew that congestion at the piers was serious. Although it was theoretically possible to ship coal independently of the exchange, it was well understood that any attempt to do so would involve great difficulty and impose upon the defendant much expense in holding vessels on demurrage to await the arrival of particular cars, when by following the uniform practice vessels could be loaded upon arrival from any coal available in Pools 5 or 7.

 Under these circumstances the words of the agreement should not be given a legal interpretation which will defeat the purpose of the parties, if by construing them more loosely and in a colloquial sense their purpose can be accomplished. The words, "the buyer hereby purchases and agrees to receive and pay for and the seller hereby agrees to ship *from the coal which it may receive from Monte Mine 1, 2 and 3* * * * which coal it has purchased from Logan-Pocahontas Fuel Company under contract," etc., are not strained too far when read, in a colloquial business sense with relation to the subject-matter and the situation of the parties, to mean shipment and delivery through the ex-

change. This, I think, is the construction to be adopted, without recourse to the fact that the parties in all their subsequent dealings adopted it. But if there be doubt or ambiguity, such doubt must be resolved consistently with the construction which the parties placed upon their own agreement. It follows that the agreement is to be construed as requiring shipment through the exchange, and delivery in kind from Pools 5 and 7, and not as requiring delivery of specific coal produced at the Monte Mines. This conclusion disposes of the counterclaim based on fraud and of defendant's contention that, having failed to deliver Monte Mine coal to defendant's vessels, plaintiff has failed to prove performance on its part.

The contract was for the sale of 100,000 gross tons f. o. b. pier during a period of nine months, the buyer agreeing to receive "a minimum tonnage per month of 11,000 tons (10% more or less)" and to furnish the necessary ships of appropriate capacities and dates of arrival to move the coal. Under these circumstances, it cannot be doubted that the words "10% more or less," which qualify the minimum monthly tonnage which the buyer is obligated to receive, were inserted for the benefit of the buyer, who was to charter vessels to carry the coal and would not be able to precisely fit the carrying capacity of the vessels chartered to exact tonnages of coal. Variations were bound to occur, and the clause was not only reasonable but necessary for the buyer's protection. Furthermore, it was for the buyer to act first by nominating a vessel to take delivery. Because the buyer was the first actor, and because the clause was for its protection, it must be held that the option lay with the buyer. Douglas Fir Exploitation & Export Co. v. Comyn, 279 F. 203 (C. C. A. 9); Crystal Paper Co. v. Robertson Co., 289 F. 15 (C. C. A. 6); Keystone Steel & Wire Co. v. Kokomo Steel & Wire Co., 1 F.(2d) 790 (C. C. A. 7); Hunt v. Stimson, 23 F.(2d) 447 (C. C. A. 6). But the clause in question qualifies only the minimum monthly installments, and its effect is to excuse and justify accidental variations above or below 11,000 tons per month which could hardly be avoided because of the inherent difficulty in furnishing vessels to load exactly that quantity. Moore v. United States, 196 U. S. 157, 168, 25 S. Ct. 202, 49 L. Ed. 428; Brawley v. United States, 96 U. S. 168, 24 L. Ed. 622; Pine River Logging Co. v. United States, 186 U. S. 279, 288, 22 S. Ct. 920, 46 L. Ed. 1164; Hadley-Dean Plate Glass Co. v. Highland Glass Co., 143 F. 242 (C. C. A. 8). This being the purpose of such words, they cannot affect the recovery of damages in case of substantial breach, i. e., failure to furnish vessels to move "a minimum tonnage per month of 11,000 tons (10% more or less)." If the contract is broken, the specified quantity measures the breach, and qualifying words such as "more or less," or the like, are disregarded in computing the damage. Moore v. United States, supra.

With this consideration of the agreement between the parties their conflicting claims of performance and nonperformance may be considered. During the months of July, August, September, October, and November difficulty was experienced in procuring shipments from the mines to Tidewater, and failure to deliver the tonnage contracted for during those months is said to defeat plaintiff's right to recover for any subsequent breach by defendant, and to give rise to defendant's counterclaim. As competent proof of the facts recited therein, there were received in evidence upon the trial reports of shipments mailed by the Logan-Pocahontas Fuel Company to the plaintiff as cars were shipped from the mines for its account. From these reports, and from proof of deliveries under the contract, it appears that the plaintiff did not fail to deliver to the defendant, through the Newport News Coal Exchange, any of the coal shipped to it at Tidewater under its contract with the Logan-Pocahontas Fuel Company. Substantial shipments were, however, made elsewhere for its account which it contends were prevented from moving to Tidewater, as follows; 32,799 tons by embargoes on all Tidewater shipments; 4501 tons by Interstate Commerce Commission Service Order No. 10; 3886 tons by Interstate Commerce Commission Service Order No. 9; 925 tons by failure to procure permit for shipment to the exchange; and 784 tons by confiscation en route to Tidewater. If the movement of this coal to Tidewater was prevented by such causes, then under the force majeure clause defendant could not assign failure to deliver it under the contract in suit as a breach thereof. It is not questioned that the delivery of 32,799 tons was prevented by embargoes on Tidewater shipments.

By Service Order No. 10 of the Interstate Commerce Commission, effective July 26, 1920, the Chesapeake & Ohio Railroad Company and other coal-carrying railroads were authorized and directed: " * * * To give preference and priority in the supply of cars for and in the transportation of bituminous coal consigned to the Ore & Coal Ex-

change (the address of which is Perry Payne Building, Cleveland, Ohio), at any Lake Erie port for transshipment by water as a part of a pool or pools of lake cargo or bunkerage coal at any such port; and to place an *embargo* on the supply of cars for or the movement of all other bituminous coal in carloads to any other consignee or destination; *provided* that this order shall not apply to coal loaded in cars furnished, placed or assigned under any order or direction hereinbefore or hereafter entered by the Commission; and provided further, that after a producer and shipper of bituminous coal, served by any of said common carriers in the said territories, has on any day shipped to the said Ore & Coal Exchange at any of the said ports a percentage (to be determined and announced for each coal producing district by H. M. Griggs, manager of said Ore & Coal Exchange, who is hereby designated as an agent of the Commission therefor) of the total number of cars to which the shipper is entitled on the said day, then this embargo shall not apply to the said shipper for the remainder of the said day to ship the remainder of the cars to which he is entitled to any consignees and destinations he may desire, including the said Ore & Coal Exchange, and the said Lake ports."

This order was continued in operation until October 27, 1920, when it was suspended by order of the Commission. Pursuant to this order the Chesapeake & Ohio Railroad Company placed an embargo effective July 26, 1920, against the acceptance of coal from any shipper on its lines except as follows:

"First—Coal loaded in cars furnished, placed or assigned under any order or direction heretofore or hereafter entered by the Interstate Commerce Commission.

"Second—After a purchaser or shipper of coal has on any day consigned to the Ore & Coal Exchange at Toledo, Ohio, for transshipment by Lake a minimum equal to the following percent of rated capacity of mine * * * in Kanawha District, 15% * * * then this embargo shall not apply to any coal offered for shipment in excess of shipments specifically outlined above."

■ It thus appears that in order to make any shipments to Tidewater it was necessary for the mines first to ship to the Ore & Coal Exchange at Toledo 15 per cent. of their rated capacity. Tonnage actually shipped from these mines to the Ore & Coal Exchange at Toledo on days when shipments to Tidewater were not prevented by direct embargo was substantially less than 15 per cent. of their rated capacity. Defendant argues

that there may have been other shipments to the Lakes made by the mines which under the terms of the order would have permitted the movement of additional tonnage to Tidewater for plaintiff's account; but since plaintiff's contract with the mines in so far as the period in question is concerned was for their output with the exception of 17 cars per month of lump and slack combined, it may reasonably be inferred that there were no additional shipments from the mines to the Lakes which affected the situation, it appearing from the proofs that only 104 of plaintiff's cars moved to the Lakes on days when there was no embargo on all shipments to Tidewater. Fifteen per cent. of the rated mine capacity on these days equals 179 cars. With the margin of 75 cars on days when coal was free to move to Tidewater at all, it cannot be assumed: First, that there were additional shipments to the Lakes of lump and slack not shown in the defendant's proofs; and, second, that if there were, additional consignments of plaintiff's coal could have moved to Tidewater under the terms of the order. If there was anything in the point, it should have been pressed at the trial so that the formal defect in proof could then have been supplied. Instead of pressing the point, counsel for defendant virtually waived it. When proof of the embargoes was being offered, counsel stated in response to a question from the court: "Oh, no, we could not have received any of the New England coal or any of the Lake coal." Then, in response to a question from plaintiff's counsel as to whether the Lake coal and the shipments to public utilities could not be eliminated, defendant's counsel replied: "If they show what was actually assigned—and that appears later—the total number of assigned cars, which is the way they are characterized for each month, we make no contention about those. Anything that moved under the Interstate Commerce Commission orders, either to New England, to the Lakes, or to public utilities—and the numbers are specified for each month by one of the witnesses—we make no claim on those at all." In response to which plaintiff's counsel said: "Alright, that will simplify it."

Of course, the allocation of cars was made at the mines, pursuant to directions given by the plaintiff. If any cars moved to the Lakes which could have moved to Tidewater, this was done in direct violation of persistent and repeated instructions given by the plaintiff to the Logan-Pocahontas Fuel Company. The record is convincing that nothing of the kind happened, and the sug-

gestion that it might have happened is an afterthought which can hardly be made the basis of defense or counterclaim in view of the defendant's position on the trial with respect to this branch of the proof.

In view of this situation, defendant should not now be heard to contend that assigned cars moving to public utilities pursuant to Service Order No. 9 of the Interstate Commerce Commission, effective July 13, 1920, which continued in effect until September 19, 1920, should have been delivered to it under the contract. This service order authorized the carriers to assign cars to coal mines for transportation of coal to public utilities in addition to and without regard to the existing ratings and distributive shares under which cars were supplied for the transportation of coal. By making shipments by means of this additional car supply, Tidewater shipments were not in any way affected. All the coal which could move to Tidewater moved regardless of these additional shipments from the mines. Nor did such deliveries to the plaintiff in any way affect the total tonnage receivable from the mines, because under the conditions which existed and the limited car supply available the mines were never able to supply the maximum tonnage per month specified in the Logan-Pocahontas Fuel Company contract. It is established by the evidence that 925 tons were shipped to Tidewater under consignment to Panhandle Coal Company, on July 2d, because of defendant's failure to nominate a vessel to receive the coal under the contract. Defendant cannot, therefore, complain of nondelivery of this tonnage. Entries upon the shipping notices evidence the confiscation of 784 tons of coal en route to Tidewater. The competency of these documents was conceded. It must therefore be concluded that plaintiff delivered all the coal which it was obligated to deliver during the months of July, August, September, October, and November.

■ Plaintiff asserts breach of the agreement during December because of defendant's failure to furnish vessels. The parties agreed to sell and to purchase coal only as coal was received by the plaintiff from Monte Mines, and defendant is under no liability for failure to accept deliveries of coal in excess of tonnage shipped from the mines unless shipments from the mines were prevented by defendant's fault. During November and previous months, when shipments from the mines were prevented by causes beyond plaintiff's control, certain so-called "borrow and loan" transactions occurred. That is, plaintiff, in order to accommodate defendant, delivered coal in excess of coal received from the Monte Mines, which defendant accepted upon the understanding that plaintiff would repay itself from future shipments of Monte Mine coal. Since the obligation of the defendants was to accept 11,000 tons of coal per month, the effect of these transactions was to cut down the amount deliverable during the following month unless Tidewater shipments were sufficient to replace the borrowed coal and permit delivery of the contract requirement of 11,000 tons as well. On December 1st, there were owing to the plaintiff from future Monte Mine shipments 5,234 tons. During December plaintiff accumulated at Tidewater substantial tonnages of coal available for loading on defendant's vessels, and repeatedly demanded that defendant furnish vessels to move this coal. Defendant nominated two vessels, which were loaded with 5,382 tons under the contract, but failed and refused, and confessed its inability, to nominate any additional vessels. As a result permits for additional shipments could not be obtained because of the accumulation of coal at Tidewater for plaintiff's account. Had the defendant during this month nominated vessels to move 11,000 tons of contract coal, plaintiff would have had no difficulty in making shipments from the mines sufficient to repay the tonnage owing to it on borrow and loan transactions and to deliver 11,000 tons under the contract as well. The borrow and loan transactions were for the accommodation of the defendant, and did not relieve it from its obligation to accept 11,000 tons during December. Having furnished vessels to carry only 5,382 tons, it is liable for failure to accept delivery of 5,618 tons.

■ For defendant's failure to accept any coal during January, February, and March, there can be no recovery. Perhaps its conduct in December amounted to repudiation of the entire agreement, which would have justified plaintiff in regarding the agreement as at an end and in suing for damages for an anticipatory breach. Plaintiff did not so regard it, but insisted upon performance by defendant and deliveries were made and accepted under the contract during January. Thus the breach, if and in so far as it was anticipatory, was waived, and the agreement continued effectively binding both parties. In this situation, and on January 10, 1921, plaintiff executed an agreement with Logan-Pocahontas Fuel Company by which the parties mutually released one another from further performance of the contract pursuant to which plaintiff had purchased the output of

the Monte Mines. Thus the contract existing between Logan-Pocahontas Fuel Company and the plaintiff, upon the existence of which the contract in suit was predicated, and by the performance of which the rights and liabilities of the parties were measured, was terminated by plaintiff's action. Reference is made to negotiations between the parties looking to the cancellation of this agreement and of the agreement in suit; but whatever these negotiations amounted to, it is entirely clear that they did not result in agreement that the Logan-Pocahontas contract be canceled or in estoppel precluding assertion that the contract in suit was thereby terminated. Defendant's obligation to receive further deliveries under its contract with the plaintiff terminated upon cancellation of the Logan-Pocahontas agreement. P. N. Gray & Co. v. Cavalliotis (D. C.) 276 F. 565. Accordingly, plaintiff is not entitled to recover damages for any subsequent breach.

Defendant's motion for the direction of a verdict will accordingly be denied, and a verdict will be directed in favor of the plaintiff for the damages which it has suffered by reason of defendant's failure and refusal to furnish vessels to move, during the month of December, 5,618 tons of coal. The amount of the verdict may be computed, with interest, by counsel, if they can agree, and upon two days' notice counsel may appear in room 3, twelfth floor, Woolworth Building, where a verdict will be directed accordingly.